312 F.2d 95
 Edwin M. DEZENDORF and Florence L. Dezendorf, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
COMMISSIONER OF INTERNAL REVENUE, Petitioner,
v.
Edwin M. DEZENDORF and Florence L. Dezendorf, Respondents.
 No. 19698.
 United States Court of Appeals Fifth Circuit.
 January 9, 1963.
 
 David L. Tisinger, Austin, Tex., for petitioners.
 William A. Geoghegan, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Crane C. Hauser, Chief Counsel, I.R.S., Claude R. Marshall, Atty., I.R.S., Joseph Kovner, Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., for respondent.
 Before HUTCHESON, CAMERON and JONES, Circuit Judges.
 JONES, Circuit Judge.
 
 
 1
 The petitioners, Edwin M. Dezendorf and Florence L. Dezendorf, his wife, seek to set aside a decision of the Tax Court which determined that they were liable for income tax deficiencies for the years 1952 and 1953 found by the respondent, the Commissioner of Internal Revenue. Edwin M. Dezendorf will be referred to as the taxpayer as Mrs. Dezendorf was not a participant in any of the transactions out of which the tax controversies arose. The taxpayer had owned and operated, for a good many years, a business of manufacturing and selling marble, feldspar and dolomite chips for terrazzo flooring and for roofing. Lands were owned and leased. Buildings, machinery and equipment were assets of the taxpayer and used in the business. Samuel C. Bilbrough, who had married the taxpayer's daughter, was employed in the business during and after 1940 with the exception of some time spent in the Army during World War II. In 1946 or 1947 Bilbrough became manager of the business and in 1951 or 1952, according to his testimony, he became "very much the general manager" of the business. During and after 1952 Bilbrough kept the books, recorded the sales and paid most of the bills.
 
 
 2
 In the taxpayer's return for 1952 a deduction of $15,128 was claimed for the abandonment of five marble quarries. The Commissioner disallowed the deduction. The Tax Court sustained the Commissioner and found that the evidence did not establish that the quarries were abandoned in 1952, and that there was an absence of evidence as to the cost or other basis of the quarries which the taxpayer claimed were abandoned in 1952. All but one of these quarries were on leased land. The taxpayer could not say when the leaseholds were acquired or state the considerations given for them. The amount spent on the leases was estimated for the purpose of determining the abandonment deduction. The taxpayer was uncertain as to when the several quarries were abandoned but his testimony was that it was around 1950 or 1951. In only one instance did he mention 1952. In his answer to a question as to when he permitted a quarry lease to lapse, he stated, "Around 1950, '51 or '52." To establish an abandonment it is necessary that there be an intention to abandon and some act evidencing that intention, and the taxpayer must not only show the intention coupled with the act but must prove that the abandonment occurred in the tax year for which the deduction is claimed. Reg. 118, § 39.23(e)-3(a); Mertens, Law of Federal Income Taxation §§ 28.17-28.18; Forman v. United States, 9th Cir.1958, 261 F.2d 181; Talache Mines v. United States, 9th Cir.1954, 218 F.2d 491, cert. den. 350 U.S. 824, 76 S.Ct. 51, 100 L.Ed. 736. There is no sufficient showing either of an abandonment or of the appropriate year of claiming the deduction.
 
 
 3
 In the 1952 return the taxpayer claimed a deduction for depreciation in the amount of $16,053.70. The depreciation was computed on a straight-line method by which the cost of the assets was divided by the estimated years of useful life and the quotient was used as the amount of annual depreciation. The Commissioner found that in determining depreciation salvage value should be taken into consideration. The depreciation was refigured and the deduction was disallowed to the extent of $2,259.45. The Tax Court sustained the action of the Commissioner. The taxpayer contended that salvage had been a factor in determining the figure against which the depreciation rate was applied. Its showing was vague and inadequate and the Tax Court properly held against it on the fact question. In the computation of the depreciation allowance, recovery is permitted only of the cost of the asset less its salvage or resale value. United States v. Massey Motors, Inc., 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592; Hertz Corporation v. United States, 364 U.S. 122, 80 S.Ct. 1420, 4 L.Ed.2d 1603. There is no error in the Tax Court's depreciation adjustment.
 
 
 4
 Bilbrough became dissatisfied with his salary and expressed this dissatisfaction in November of 1952. The taxpayer submitted two documents to Bilbrough; one an employment contract and the other an agreement for the sale of the business. Neither contract was satisfactory to Bilbrough. The taxpayer wanted a down payment on a sale and Bilbrough was not able to make one. In December of 1952, the taxpayer told Bilbrough that "he would make an agreement of some kind that would be satisfactory." At or about this time it was agreed that Bilbrough would continue as manager of the business during 1953, and the taxpayer paid him a $1,500 bonus for his services in 1952. During 1953 Bilbrough drew a salary from which the taxpayer withheld income and Social Security taxes. Policies of insurance on the properties used in the business remained in the taxpayer's name. No transfers of registered titles were made of any of the motor vehicles used in the business. There was no assignment of the registered trade name under which the business was conducted. During the year the taxpayer withdrew from the business the sum of $35,000. Sometimes the withdrawals were made through Bilbrough but on other occasions the taxpayer took money without asking Bilbrough.
 
 
 5
 The taxpayer signed some sort of an agreement on January 1, 1953, but it was not signed by Bilbrough and was not satisfactory to Bilbrough. It was not regarded by the taxpayer as a final agreement. Bilbrough, his wife, and their lawyer, as late as the latter part of 1953, were objecting to the taxpayer's terms. By the taxpayer's testimony, because of "the squabble going on and changing this and that it was January 4th [1954] before it was finally rewritten and signed to suit them but the business was in his hands all of '53." On January 15, 1954, there was a closing of the sale of the marble business from the taxpayer to Bilbrough for a stated consideration of $320,000, deeds and a bill of sale were executed and delivered by the taxpayer conveying to Bilbrough the real estate and personal property used in the business, and the Bilbroughs gave back a mortgage which recited that "This agreement shall be effective as of January 1, 1953, and all transactions herein referred to shall, for all legal purposes, be treated as though they occurred January 1, 1953." The mortgage was given to secure $300,000 principal payable on January 1, 1973, with interest at six per cent payable monthly.
 
 
 6
 In January of 1954 entries were made in the books of the business allocating $19,200 of the taxpayer's 1953 withdrawals to interest on a $320,000 sale price, and the remainder of $15,800 was allocated to a principal down payment of the sale price. Also in January of 1954, Bilbrough borrowed money from a bank and paid the taxpayer the balance of the $20,000 down payment, the taxpayer surrendered the trade name of Dezendorf Marble Company and a certificate for the assumed name was filed by Bilbrough. On February 1, 1954, the authority of the taxpayer and his wife to sign checks on the business bank account was terminated. In the tax return for 1953, the taxpayer did not report the sale of Dezendorf Marble Company. He did report interest income from that Company in the amount of $19,200. The Commissioner, in determining a tax deficiency of the taxpayer for 1953, decided that the sale of the business was not made in 1953, as contended by the taxpayer, and that taxable income from the earnings of the business in the amount of $33,949 had been realized during 1953. The taxable income was increased in the Commissioner's determination of a deficiency. This conclusion resulted in the elimination from taxable income of the reported $19,200 as interest. The taxpayer urges that there is no basis for not believing the testimony of Dezendorf and Bilbrough that the sale was made in 1953. They urge that a parole contract is not void but merely unenforceable.
 
 
 7
 The principle for which the taxpayer contends, that a parole sale of real estate is valid as between the parties under the law of Texas, is not applicable to the facts here established, however sound it may be as an abstract rule of law. Here there was perhaps an understanding in 1953 that an agreement would be reached. In order that there be sale for tax purposes there must be no less than a binding agreement that the title will be conveyed by the vendor to the vendee for a stated or determinable consideration payable in a specified manner. Mertens, Law of Federal Income Taxation §§ 12.119-12.120; Frost Lumber Industries v. Commissioner, 5th Cir.1942, 128 F.2d 693. As long as there was a "squabble" going on and a "changing this and that" and the contract was not rewritten to suit the purchasers until January 4, 1954, the transaction was contingent. We are in agreement with the Tax Court that there was no sale upon which tax incidence could be predicated until 1954.
 
 
 8
 Our conclusions are in accord with those of the Tax Court. Its decision is
 
 
 9
 Affirmed.