FRANK R. HAMMERSTROM AND JEWEL HAMMERSTROM, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5736–71.   Filed May 7, 1973.

*Gary C. Randall*, for the petitioners.
*Vivian T. Martinez, Jr.*, for the respondent.

HALL, *Judge:* Respondent determined a deficiency of $8,362.51 in petitioners' 1967 Federal income tax. The issue presented for our decision is whether in 1967 petitioner Jewel Hammerstrom disposed of certain business assets before the end of their estimated useful life for investment credit purposes, thereby triggering investment credit recapture in the year of disposal.[1]

### FINDINGS OF FACT

All of the facts have been stipulated by the parties, and the stipulations and exhibits attached thereto are incorportated herein by reference.

Petitioners, Frank R. and Jewel Hammerstrom, were husband and wife on December 31, 1967, and filed a joint 1967 Federal income tax return with the district director in Seattle, Wash. Frank R. Hammerstrom is a party to this proceeding solely because a joint return was filed, and hereinafter "petitioner" shall refer to Jewel Hammerstrom.

The petitioners were residents of Metaline Falls, Wash., when they filed their petition in this proceeding.

Petitioner and her former husband, Clifford Bockman, were divorced on October 13, 1967. During the years of their marriage, they had filed joint Federal income tax returns on which they claimed the investment credit for certain business assets used in their logging and contract business, carried on under the name of Bockman Logging Co.

---

[1] Petitioners have conceded the following adjustments: Disallowances for business loss of $1,980.65, attorney's fees of $3,277, and rent expense of $250.

These assets were the community property of petitioner and Clifford Bockman.

On October 12, 1967, incident to their divorce, petitioner and her former husband entered into a property settlement agreement, the pertinent provisions of which are as follows:

This agreement is made this 12th day of October, 1967 between Clifford H. Bockman, hereinafter referred to as "Husband" and Jewel D. Bockman, hereinafter referred to as "Wife". The parties agree with each other as follows:

\* \* \* \* \* \* \*

### III

Husband and Wife after consultation with their respective attorneys, who are of their respective choosing, have been advised that it was the opinion of their said attorneys that it would be in the best interests of the parties to dispose of their property rights in such a manner as to obviate post-divorce relations between the parties relative to the property, including joint ownership of any nature therein. However, the parties of their own choosing find that they cannot and do not wish to follow this advice, and, therefore, execute this agreement with full knowledge of the legal relationship and consequences attendant upon the special relationship that will exist for sometime to come relative to the property rights of the parties as hereinafter delineated.

\* \* \* \* \* \* \*

### XII

The Wife shall receive as her sole and separate property:
(a) The Pontiac Bonneville automobile
(b) Small personal effects
(c) The grand piano
(d) The electronic oven
(e) Glenna Dean's bedroom set
(f) The dining room set
(g) The other children's personal beds
(h) Other small items and her personal clothing and effects.
The Wife shall also receive as her separate property a $1,000.00 life insurance policy on her life with Olympic National Life Insurance Company including any cash value along with the right to change beneficiary thereon.

### XIII

The Husband shall receive as his sole and separate property:
(a) a 1963 Cadillac automobile
(b) a $2,000.00 life insurance policy with Manufacturer's Life Insurance Company on his life with any cash value and with the full right to change the beneficiary on same.

### XIV

The parties own all their property, both personal and real estate, as community property and the interests are substantial in both the real estate, consisting of a home, certain acreage north of Ione with contiguous river front property on the Pend Oreille River, and situated on the said property is a machine shop

containing logging and contracting equipment and a second small residence. It is the desire of the parties to liquidate within a reasonable period after the execution of this agreement and its approval by the Court having jurisdiction of the divorce complaint, and to nearly as possible divide equally the proceeds of such liquidation between them. To this end the parties have reached the agreements in the subsequent clauses. PROVIDED, HOWEVER, that Wife shall have the option to purchase river frontal property now existing inside of the fence line east to the river at such figure as Husband may see fit to accept from any bona fide prospective purchaser.

XV

The parties shall as of the date of the entry of the divorce decree, in which approval of this property settlement agreement is expected, become tenants-in-common as to the entire range of community property, both real and personal, in which they have an interest and wherever the same may be situated. The Husband shall have the responsibility and right to continue the contracting business now rendered under the name of Bockman Logging Company as a sole proprietorship, including the right to determine during the liquidation period what contracts are undertaken and the manner of their performance and in no sense, shall he be limited in the conducting of such operations other than is set forth herein.

(a) The Wife shall have the right to a monthly report on the conduct and profit and loss condition of the aforesaid business prepared by a bookkeeper satisfactory to the parties, which reports will be periodically examined by a certified public accountant, also approved by the parties.

(b) It is understood also that on the business checking accounts of the parties, that both parties' names will be retained thereon with the bookkeeper, chosen by the parties, during the liquidation period, it being the intention of the parties that only one signature is required for the conduct of the business, but it is also explicitly covenanted by each party to the other that neither will utilize the business accounts in a manner deliberately detrimental to the personal interests of the other party.

(c) The Husband will in the said monthly reports acquaint the Wife with any purchases or sales either by way of liquidation or by addition to the business property.

(d) During the liquidation period, but while the business is maintaining operations, the parties shall bear equally the losses and share in the profits of the business. * * *

(e) It is also understood that titles to logging and contracting equipment may remain in the Husband's name and he may acquire business equipment in his name from business assets. PROVIDED, HOWEVER, that in liquidation thereof, the same shall be subject to distribution as aforesaid.

(f) The parties agree and acknowledge further that neither is limited to the acquisition of any separate or other type property after the entry of the divorce decree from the personal property and profits of the business, PROVIDED, HOWEVER, that the same shall as to the Husband be liable for the payment of child support mentioned herein, the premiums on the $75,000.00 life insurance policy and the medical and health insurance coverage.

(g) The Husband shall have the full right of use and occupancy of all the real estate by the parties during the liquidation period, PROVIDED, HOWEVER, that all utility and other charges of up-keep other than mortgage payments shall be his personal responsibility and not that of the parties.

(h) During the liquidation period, all profits that would otherwise be accruable to the Wife shall be retained in the business accounts and may be utilized by the Husband in the operation of the business until the final settlement date upon liquidation of the business and disposition and sale of all the real estate belonging to the parties.

(i) The Husband shall have the full right during the liquidation period to choose and determine whether or not liquidation shall take place during the said period and under what terms and conditions, PROVIDED, the same are not completely unreasonable, vendictive [sic] or patently in dereliction of the rights of the Wife to receive some share of the business and real estate upon liquidation. In the event that liquidation is not in the Wife's opinion being performed in a proper manner by the Husband, then in that event, a liquidator or trustee acceptable to both parties shall be chosen for the purpose of liquidation of all the property and in the event of the serious disability or death of the Husband, such trustee or liquidator shall be chosen by the Wife and by the personal representative of the estate of the Husband.

## XVI

The period of liquidation shall be a period of one year commencing November 1, 1967.

\*         \*         \*         \*         \*         \*         \*

## XVIII

It is the intention of the parties from and after the date of the entry of the divorce decree referred to above to become and remain tenants-in-common and not joint tenants with or without the right of survivorship in and to both the real estate and personal property of every name and nature in which they presently have an interest. It is not the intention of the parties to otherwise limit the acquisition of other separate or community property after the date of such decree.

## XIX

The parties agree to sign necessary instruments necessary to convey their interests in and to both the real estate and personal property upon sale, distribution, dissolution or liquidation.

## XX

It is also specifically understood and agreed that by the giving of written notice, the Husband at any time during the period of liquidation above referred to, may elect to purchase all of the Wife's rights which she shares as tenant-in-common with the Husband, by agreeing to enter into an obligation whereby he will pay her the sum of $25,000.00 over a ten year period, in installments of $2500.00 or more annually, with interest at 6% per annum payable on the declining balances and computed from the date such agreement takes effect. It is specifically understood that such payments shall not constitute either as alimony or child support but as a property settlement right and the right to choose such option shall be exclusive to the Husband during his life time only.

## XXI

During the liquidation period, the Husband shall have from the operation income of the business the sum of $900.00 per month payable semi-monthly on

the 10th and 25th of each month as and for a salary for his management and work as operator of the business during such liquidation period.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands this 12th day of October, 1967.

(S) CLIFFORD H. BOCKMAN
*Husband*

(S) JEWEL D. BOCKMAN
*Wife*

On October 18, 1967, petitioner's former husband duly and validly elected under article XX of the property settlement agreement to purchase petitioner's interest in all assets they held as tenants in common. The election was contained in a letter from his lawyer to petitioner's lawyer which provided in part as follows:

This will confirm our telephone conversations of this morning.

To recapitulate just a little, Mr. Bockman was, to say the least of it, shocked and taken aback by Mrs. Hammerstrom's activities in writing the checks of $1,000.00 and those others I mentioned to you, which were written a short time ago without informing him of the need, reason or the fact of the drawing itself. As I explained to you, he could not in any sense operate under such conditions and apparently, she is not convinced of the fact that such writings were and would be in violation of the spirit, if not the very letter of their agreement.

On the other hand, Mr. Bockman is not disposed now that the divorce is over with towards continuing the fight, if it can be avoided. He has other remedies, as you know, which could have been utilized and were not, and these too he hopes to avoid.

In summation, therefore, he has elected, under the terms of the agreement, to purchase out the rights of the former Mrs. Bockman under a contract which would, at my suggestion, be placed in escrow at the Ione State Bank, along with the necessary deeds and bills of sale, pending final payment of the purchase price of $25,000.00. It is his firm conviction, however, that due to the fact that Mrs. Bockman took this $1,000.00 we are speaking about, on the evening she signed the agreement, that this must be applied against the first year's payments, which will start to be paid monthly commencing November 1, 1967, if we can get an agreement prepared in time.

\*   \*   \*   \*   \*   \*   \*

Needless to say, this is a capsule outline of what needs to be done, but in effect, it is also official notice of his election under the terms of the contract, providing everything can be worked out as stated.

In the meantime and until Mrs. Hammerstrom agrees to some agreement, a stop-payment has been placed against the $1,000.00 check and she will not be a signatory to the business accounts. However, I think these are intermediate matters and I am hopeful that she will prove reasonable.

Finally, I want to emphasize for her benefit, my solemn belief that Mr. Bockman wishes to put an end to the fighting and I am requesting her, based on our long friendship, to approach this matter reasonably rather than with vehemence, violence or bitterness. She is aware that I have tried to balance matters between the parties and I am hopeful that now that the point of a final contract has been reached, that we can have a conclusion which will be acceptable, if not satisfactory, to both parties.

\*   \*   \*   \*   \*   \*   \*

P. S. I am willing to draw the contract, most of which charge then would be applicable to Mr. Bockman and you could then charge Mrs. Hammerstrom for any change you have in reviewing or in advice relative to the contract. How does it strike you? Also perhaps real estate and chattel mortgages with the same general ideas might prove better security.

On November 15, 1967, Clifford Bockman's lawyer again wrote to petitioner's lawyer in part as follows:

I simply fail to understand the delay that Mrs. Hammerstrom is interposing in this situation. The last I heard about the project was that she did not want to sign a contract until the parties' son, Roger, had returned home. He has been here for approximately two weeks and still we have had no word concerning the contract, which we feel, is in every sense of the word required under the circumstances by the parties' very own agreement.

In order that there is no misunderstanding about the situation and in order to assure Mrs. Hammerstrom of Mr. Bockman's intention in this regard, I am authorized to advise that a check for $1,000.00 will be placed in my office immediately upon receipt of favorable word to the effect that Mrs. Hammerstrom is ready to execute the necessary documents to place in effect the agreement to purchase her interest by Mr. Bockman. This is to apply on the first year's principal and interest, which we consider to run from the date the notice was given to you that Mr. Bockman was electing to purchase Mrs. Hammerstrom's share of the property that was the community property of the parties and referred to in the Property Settlement Agreement.

I sincerely believe that any delay is no longer valid under any circumstances nor justified by any of the activities or actions or words of the parties. This is now simply a matter of executing what the parties have already agreed to and I think we have cooperated in every sense by offering to allow you to draw the necessary documents so that there is a retention by Mrs. Hammerstrom of a security interest sufficient to guarantee payment. The only stipulation that I make in this instance is that Mr. Bockman have free control over the buying and selling of the property so that his business is not endangered by any such security interest that Mrs. Hammerstrom might desire. I am sure I can convince Mr. Bockman that this is only fair.

\* \* \* \* \* \* \*

As a courtesy, but not by way of obligation, Mrs. Hammerstrom has been forwarded a statement as to the results of the October business. We expect that it will not be necessary to prepare such a statement for November. Not only is it time consuming, but it is expensive and unnecessary under the circumstances.

Again on December 6, 1967, Clifford Bockman's lawyer wrote petitioner's lawyer in part as follows:

It seems we are going down a one-way street as far as Mrs. Hammerstrom is concerned, but there are certain things which must immediately be called to your attention and I am taking this opportunity to do so, not in a spirit of recrimination or criticism of Mrs. Hammerstrom, but with the hope that we can soon reach agreement on the final terms of Mr. Bockman's purchase of Mrs. Hammerstrom's interest.

However, for 5 years thereafter, as a result of differences between the parties, the parties did not enter into an agreement, petitioner did not execute any instruments of transfer, and her former husband did not

make any installment payments. Finally the parties resolved their differences by negotiating a Purchase and Settlement Agreement, executed on or about December 15, 1972, which provided as follows:

### PURCHASE AND SETTLEMENT AGREEMENT

WHEREAS, CLIFFORD H. BOCKMAN of Ione, Washington, hereinafter referred to as First Party, did enter into a Property Settlement Agreement with JEWEL D. BOCKMAN, now by marriage, JEWEL D. HAMMERSTROM of Metaline Falls, Washington, hereinafter referred to as Second Party, which Agreement is dated the 12th day of October, 1967, and

WHEREAS, the said Property Settlement Agreement was ratified, confirmed and incorporated in the Decree of Divorce between the parties entered in Lincoln County, Washington on the 13th day of October, 1967, and

WHEREAS, in said Agreement and by said Decree, the parties became Tenants-in-Common as to the entire range of community property, both real and personal, in which they had an interest and wherever the same was situated at the time of execution of the Agreement, and

WHEREAS, the First Party was granted the right as sole proprietor to continue the business in which the parties were involved prior to divorce, and

WHEREAS, difficulties arose from and after the Divorce as to the liquidation of the said interests, but more particularly, in relation to the exercise by First Party of an option to purchase Second Party's interest as provided for in Clause XX of said Agreement, which exercise was made in writing on the 18th day of October, 1967, and

WHEREAS, the parties have now reached an agreement wherein the First Party may exercise in full his right of purchase,

Now, THEREFORE, BE AND IT IS HEREBY AGREED between the parties as follows:

1. The sum of $25,000.00 is declared to be the amount due on the principal of the purchase price of Second Party's interest referred to in Clause XX and no part of said sum has yet been paid. It is understood that had an agreement been entered into by the parties after the exercise of the option to purchase as aforementioned, certain sums in interest would be payable in accordance with the installment provisions contained in said Agreement. No part of said sums have been paid.

2. At the time of execution and closing of this Agreement, First Party agrees to pay by Cashiers Check to the Second Party in full and complete settlement of all obligations, direct or indirect, in relation to the purchase of Second Party's interest contemplated by said Agreement, the principal sum of $25,000.00 plus the compromised sum of $2,000.00 for interest plus an additional $1,000.00 in consideration of a dispute between the parties over a $1,000.00 personal check issued by Second Party as Mrs. Clifford H. Bockman payable to herself against the joint checking account prior to their divorce, for a total sum of $28,000.00. From said sum shall be deducted the sum of $582.51 representing a business account Second Party owes First Party based on a transaction of recent date and for which First Party shall provide Second Party with a receipt showing full payment thereof.

3. Acceptance of the aofresaid [sic] net sum of $27,417.49 shall in every respect, directly and indirectly, constitute a full compromise of all sums either party might claim from the other by virtue of any of the clauses in said Agreement, EXCEPT those clauses relating to life insurance and child support, which are to be considered as separate and apart from the terms of this agreement. * * *

4. It is understood that under no circumstances shall the First Party be required to account to Second Party for any of the operations of the business prior or subsequent to the Property Settlement Agreement above referred to. * * *

5. It is contemplated that by execution of this Agreement and the instruments contemplated herein, that the relationship previously existing between the parties as Tenants-in-Common to all property referred to directly or indirectly in the Property Settlement Agreement, Decree of Divorce and this Agreement, shall thereupon terminate both as to described property and any property acquired in the course of business by the First Party.

6. The parties shall be obligated for their respective shares of the closing costs incidental to this Agreement, and individually as to their respective counsel. This Agreement is subject to the execution of the necessary documents of transfer of the properties referred to herein, whether presented herewith or found to be necessary at a future date.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals this 15th day of December, 1972.

(S) Clifford H. Bockman
CLIFFORD H. BOCKMAN, *First Party*

JEWEL D. BOCKMAN, now by marriage,

(S) Jewel D. Hammerstrom
JEWEL D. HAMMERSTROM, *Second Party*

At the same time petitioner and her former husband executed a Transfer of Interest in Personal Property, which provided as follows:

### TRANSFER OF INTEREST IN PERSONAL PROPERTY

JEWEL D. BOCKMAN, now by marriage, JEWEL D. HAMMERSTROM, of Metaline Falls, Washington, hereinafter referred to as Transferor, and CLIFFORD H. BOCKMAN of Ione, Washington, hereinafter referred to as Transferee, do hereby agree with each other as follows:

1. The parties did enter into a Property Settlement Agreement which was ratified, confirmed and incorporated in a Decree of Divorce between the parties in Lincoln County, Washington on the 13th day of October, 1967.

2. The parties became Tenants-in-Common as to the entire range of community property, both real and personal, in which they had an interest and wherever the same was situated at the time of execution of the agreement with the exception of certain items personal to each of the parties, awarded to each respectively by the Court. The Transferee was granted the right as the sole proprietor to continue the business in which the parties were involved prior to the divorce and the personal property and the business referred to in the Decree in which the parties have had an interest as Tenants-in-Common has been in the Transferee's control since the time of the divorce.

3. The Transferee, by virtue of the Divorce Decree and the Property Settlement Agreement, was granted an option to purchase the Transferor's interest in all of the personal property aforementioned with the exception of those items referred to in the Agreement personal to each party.

4. For a good and valuable consideration, and in consideration of the payment agreed to by and between the parties in a Purchase and Settlement Agreement dated December 15, 1972, the Transferor does hereby transfer, assign, sell and deliver unto the Transferee, all of her right, title and interest in and to all of the personal property aforementioned with the foregoing exceptions, including all rights in relation to the business known as Bockman Logging Company at

the time of the divorce, and as Bockman Construction Company at the present time, with the understanding that this transfer relates back to the items as the same existed at the time of the divorce or as items were acquired thereafter or as the same may hereafter be acquired, it being the intention of the parties hereto to hereby transfer all past, present or future interests in and to the properties directly or indirectly related to the subject matter of the Divorce Decree, including both choate and inchaote [sic] rights, including any right to income from the said business enterprise.

5. This transfer is subject to encumbrances the Transferee may have placed on any of the said properties since the time of the Divorce Decree for which the Transferee does assume full obligation to pay.

6. This instrument divests the Transferor of all community and separate rights in and to the property which is the subject matter hereof, including those rights as Tenant-in-Common with the Transferee.

7. The parties expressly waive the requirements, if any, of the Washington State Bulk Sales Act (RCW 62a.6).

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands this 15th day of December, 1972.

JEWEL D. BOCKMAN, now by marriage,
(S) Jewel D. Hammerstrom
JEWEL D. HAMMERSTROM, *Transferor*
(S) Clifford H. Bockman
CLIFFORD H. BOCKMAN, *Transferee*

The assets on which investment credit was claimed (and for each of which petitioner and her former husband claimed a 6-year useful life) which respondent alleges were disposed of or ceased to be section 38 property prematurely in petitioner's hands, are the following:

| Assets | Date acquired | Assets | Date acquired |
|---|---|---|---|
| Adams motor grader | 11/21/62 | 43 GMC truck | 10/14/64 |
| 63 Freehauf [sic] trailer | 6/ 5/63 | 42 Chev truck | 10/14/64 |
| Lincoln welder | 3/ 8/63 | Michigan loader | 5/24/64 |
| 58 Dodge truck | 1/ 2/63 | Mack truck | 2/ 3/65 |
| 44 red truck | 1/ 2/63 | Mack truck | 7/12/65 |
| H D 16 dozer | 7/25/63 | Jammer | 3/31/65 |
| H D 16 dozer | 7/25/63 | 66 GMC truck | 10/ 1/65 |
| Typewriter | 1/18/64 | 65 Pontiac | 5/25/65 |
| 64 Chev pickup | 2/ 6/64 | 57 Adams grader | 1/ 1/65 |
| H D 16 tractor | 6/15/64 | | |

Subsequent to October 18, 1967, petitioner's former husband sold the following of these assets:

| Assets | Acquired | Sold |
|---|---|---|
| Mack truck | 7/12/65 | 11/ 3/67 |
| Jammer | 3/31/65 | 10/28/68 |
| Adams motor grader | 11/21/62 | 2/25/69 |
| 58 Dodge truck | 1/ 2/63 | 1971 |

In addition, in 1968 petitioner's former husband converted to his personal use the 1965 Pontiac which had previously been used in the business. Record title to all assets in issue in this case was always in the name of the former husband who was manager of the community property.

On their 1967 joint return, petitioners claimed a net operating loss of $1,980.88 for the period January 1 to October 18, 1967, representing petitioner Jewel Hammerstrom's one-half interest in the net operating loss of Bockman Logging Co. to October 18, 1967. Petitioner has received no income and has claimed no losses arising from Bockman Logging Co. since October 18, 1967. Petitioner's former husband has reported on his Federal income tax returns all profits and losses from the business since October 18, 1967.

### ULTIMATE FINDING OF FACT

Petitioner retained ownership in her half interest in the business assets at all times during 1967.

### OPINION

Petitioner and her former husband owned a logging and contract business as community property prior to their divorce on October 13, 1967. In a property settlement agreement the parties agreed to convert the business assets from community property to property held as tenants in common. They also agreed that the husband should continue to operate the business on their behalf until it could be liquidated. Finally, they agreed that the husband, by giving written notice, could elect to purchase petitioner's interest in the business "by agreeing to enter into an obligation" to pay her $25,000 over a 10-year period. Petitioner's former husband made a valid election on October 18, 1967, but thereafter the parties were unable to agree on the terms of the sale until 5 years later, at which time they entered into a Purchase and Settlement Agreement and a Transfer of Interest in Personal Property.

Petitioner asserts that under the property settlement agreement entered into by her and her former husband there was an equal division of the community property between them, which, petitioner contends, is not a taxable event giving rise to investment credit recapture under section 47.[2] Secondly, petitioner contends there was no sale or disposition by her of any of the business assets in issue during the calendar year 1967.

Respondent does not, at least explicitly, take issue with petitioner's contention that petitioner is not subject to investment credit recapture

[2] All Code references are to the Internal Revenue Code of 1954, as in effect during the year in issue.

merely as a result of the division of the community property. Respondent, however, contends that petitioner sold or disposed of the business assets in issue on October 18, 1967, as a result of her former husband's valid election under article XX of the property settlement agreement to purchase those assets.

We are cited to no cases dealing with investment credit recapture under the circumstances here presented, and we look to the statute, the regulations, and the legislative history for guidance.

The statutory provisions involved are sections 47(a)(1) and (b) which provide:

(a) GENERAL RULE.—Under regulations prescribed by the Secretary or his delegate—

(1) EARLY DISPOSITION, ETC.—If during any taxable year any property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer, before the close of the useful life which was taken into account in computing the credit under section 38, then the tax under this chapter for such taxable year shall be increased by an amount equal to the aggregate decrease in the credits allowed under section 38 for all prior taxable years which would have resulted solely from substituting, in determining qualified investment, for such useful life the period beginning with the time such property was placed in service by the taxpayer and ending with the time such property ceased to be section 38 property.

\* \* \* \* \* \* \*

(b) SECTION NOT TO APPLY IN CERTAIN CASES.—Subsection (a) shall not apply to—

(1) a transfer by reason of death, or

(2) a transaction to which section 381(a) applies.

For purposes of subsection (a), property shall not be treated as ceasing to be section 38 property with respect to the taxpayer by reason of a mere change in the form of conducting the trade or business so long as the property is retained in such trade or business as section 38 property and the taxpayer retains a substantial interest in such trade or business.[3]

The following questions are raised:

1. Did the transmutation of the business assets of the couple to tenancy in common from tenancy in community constitute a disposition of such assets giving rise to investment credit recapture?

2. Was there a sale or other disposition by petitioner of petitioner's interest in the couple's business assets on October 18, 1967, when petitioner's former husband elected under article XX of the property settlement to purchase all petitioner's interest in those business assets?

*Transmutation of the Tenancy in Community to Tenancy in Common*

The property settlement agreement between petitioner and her former husband called for the conversion of the business assets of

---

[3] Sec. 48 defines "section 38 property" to mean, expressed very generally, depreciable tangible personal property having a useful life of at least 4 years.

the couple from community property to property held by them as tenants in common. The threshold question, therefore, is whether this conversion, standing alone, was a disposition of section 38 property? Paraphrasing the language of section 47(a)(1), did it result in the business assets ceasing to be section 38 property with respect to petitioner?

Prior to the divorce petitioner and her former husband each had a present, equal, and existing interest in one-half the community property business assets. *Poe* v. *Seaborn*, 282 U.S. 101 (1930); *United States* v. *Merrill*, 211 F. 2d 297 (C.A. 9, 1954); *Armorel Kamins*, 54 T.C. 977 (1970); *In re Leuthold's Estate*, 324 P. 2d 1103 (Wash. 1958). After the divorce they continued to hold undivided interests in the same property as tenants in common. For the reasons stated hereafter, we hold that such conversion did not give rise to investment credit recapture.

"Disposition" is not defined in section 47. However, both the House and Senate committee reports state that property will be considered disposed of "whenever it is sold, exchanged, transferred, distributed, involuntarily converted, or disposed of by gift." H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 510; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 852–853.

The regulations, sec. 1.47–2(a)(1), are unhelpful, stating only that "disposition" includes "a sale in a sale-and-leaseback transaction, a transfer upon the foreclosure of a security interest and a gift, but such term does not include a mere transfer of title to a creditor upon creation of a security interest."

Recapture of investment credit is triggered not only by early disposition, but also if section 38 property otherwise ceases to be section 38 property with respect to the taxpayer. Section 38 property, however, will not be treated as ceasing to be section 38 property with respect to a taxpayer "by reason of a mere change in the form of conducting the trade or business so long as the property is retained in such trade or business as section 38 property and the taxpayer retains a substantial interest in such trade or business." Sec. 47(b).

The Senate report, *supra*, pp. 852–856, illustrates the intent of section 47 (a)(1) and (b), as follows:

Except as provided in section 47(b), whenever section 38 property is disposed of, such property ceases to be section 38 property with respect to the taxpayer. In general, property will be considered disposed of whenever it is sold, exchanged, transferred, distributed, involuntarily converted, or disposed of by gift. Thus, a cessation will occur when property is contributed to a partnership or to a corporation. (However, see sec. 47(b) for an exception where the contribution of property constitutes a mere change in the form of operating the trade or business.) Generally, the lease of property is not considered to be a disposition for purposes of applying section 47. However, if a taxpayer leases out property

which he would ordinarily dispose of by sale or exchange and it appears that a purpose of the lease is to avoid the application of section 47, then such lease will be considered a disposition.

Additional examples of property ceasing to be section 38 property include (1) property (or a portion thereof) which is no longer subject to depreciation with respect to the taxpayer because, for example, it is shifted from a business to a personal use, and (2) property which is used in any taxable year predominantly outside the United States, by a governmental unit, etc. Similarly, property of a partnership (or subch. S corporation or estate or trust) ceases to be section 38 property with respect to the taxpayer (partner, shareholder, or beneficiary) when such taxpayer sells his interest in the partnership (or shares of stock or beneficial interest). Furthermore, when section 38 property is leased, and the lessor elects to treat the lessee as the purchaser of the property under section 48(d), a termination of the lease will result in the application of section 47 with respect to the lessee, unless the property does not cease to be section 38 property with respect to the lessee.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

In addition, subsection (b) of section 47 provides, in effect, a suspension of the application of section 47(a) where there has been a mere change in the form of conducting a trade or business so long as (1) the property is retained in such trade or business as section 38 property, and (2) the taxpayer retains a substantial interest in such trade or business. On the occurrence of any event which results in a failure to meet either of the conditions described above, the property will be deemed to cease to be section 38 property when such event occurs. Thus, in determining whether the property ceases to be section 38 property before the close of its estimated useful life, the period the property was held as section 38 property before the mere change in form of conducting the trade or business will be tacked on to the period beginning with the change in form and ending with the occurrence of the event which results in a failure to meet either of the conditions specified in the first sentence of this paragraph.

The phrase "a mere change in the form of conducting the trade or business" (whether through incorporation, the formation of a partnership, or otherwise) applies only to cases where the properties of a trade or business are transferred. Thus, the transfer of section 38 assets to a newly formed corporation in a transaction to which section 351 applies will not fall within the scope of the exception unless the transaction involves the transfer of the trade or business in which such assets were used.

The determination of whether the taxpayer has retained a substantial interest in the trade or business is to be made immediately after the change in form of conducting the business, as well as after each time the taxpayer disposes of a portion of his interest in the new enterprise. However, in any case where a taxpayer's interest in the business of the new enterprise remains constant in relation to his former interest, the taxpayer will be considered as having retained a substantial interest in the trade or business. Thus, where a taxpayer owns a 5-percent interest in a partnership, and after the incorporation of that partnership the taxpayer retains a 5-percent interest in the corporation, the taxpayer will be considered as having retained a substantial interest in the trade or business as of the date of the change in form.

In this case each spouse retained his or her respective undivided interest in the property. While a change in the form of ownership took place, we find no authority suggesting that such change would

constitute a "disposition," and, indeed, with due consideration of the legislative purpose of the investment credit recapture rules, we see no plausible reason why such a change in the form of ownership should be held to trigger recapture of investment credit. Certainly, within the ordinary meaning of the word, no "disposition" had taken place for the quantum of ownership retained by each party remained unaffected by the change in the form in which title was held by them jointly, and in the absence of any contrary indication in the legislative history, words in the taxing statute are to be given their ordinary meaning. *Commissioner* v. *Brown*, 380 U.S. 563, 570–571 (1965). Moreover, the Commissioner, while not conceding the point, has advanced no arguments to the contrary.

We hold that such transmutation is not a "disposition" within the meaning of section 47(a)(1). However, even if there were a "disposition" within the meaning of section 47(a)(1), such disposition would still not trigger recapture because of the provisions in section 47(b). In the words of that section, there has been "a mere change in the form" of holding title to the assets (community property to property held as tenants in common) and petitioner "retains a substantial interest" in the business (one-half before the effective date of the property settlement agreement and one-half thereafter). Therefore, under the facts of this case, the petitioner's interest in the property did not cease to be section 38 property, and the transmutation of the community property business assets to property held as tenants in common did not give rise to investment credit recapture.

*Exercise by Former Husband of Election to Purchase Petitioner's Business Assets*

The second issue is whether the former husband's October 18, 1967, election to purchase petitioner's one-half interest in the business assets triggered investment credit recapture in 1967. In the property settlement agreement petitioner and her former husband agreed that it was their desire to liquidate their former community property (which under the property settlement agreement was converted into property held as tenants in common), and that during the liquidation period (November 1, 1967, through October 31, 1968) petitioner's former husband was to continue to carry on the business of Bockman Logging Co. as though it were his sole proprietorship. He was to account to petitioner monthly, he and petitioner were to bear losses and share profits equally, he was to receive a salary of $900 per month until the final liquidation of the business, and petitioner was not to withdraw any of her profits from the business.

In addition, in article XX the parties agreed that petitioner's former husband might elect to purchase all of petitioner's share of the business "by agreeing to enter into an obligation whereby he will pay her the sum of $25,000.00 over a ten year period, in installments of $2500.00 or more annually, with interest at 6% per annum payable on the declining balances and computed from the date such agreement takes effect."

The parties executed the property settlement agreement on October 12, 1967, and on October 18, 1967, petitioner's former husband made the election under article XX. However, for 5 years thereafter, the parties did not enter into an agreement, no payments were made by petitioner's former husband to petitioner, and petitioner did not execute any instruments of transfer.

In 1972 the parties entered into negotiations to reach an agreement under the terms of article XX of the property settlement agreement. The results of the successful negotiations are contained in two documents, both dated December 15, 1972, entitled "Purchase and Settlement Agreement" and "Transfer of Interest in Personal Property."

The Purchase and Settlement Agreement recites that difficulties arose between the parties in relation to the exercise by petitioner's former husband of the option to purchase petitioner's interest as provided in article XX of the property settlement agreement, and the parties agreed that if "an agreement [had] been entered into by the parties after the exercise of the option to purchase as aforementioned, certain sums in interest would be payable in accordance with the installment provisions contained in said [property settlement] Agreement." They then agreed to settle their differences and consummate a sale of petitioner's interest to her former husband for a lump-sum payment of $25,000 plus a compromise sum of $2,000 interest, and that petitioner's former husband would not be required to account to petitioner for the operation of the business either prior to or subsequent to the property settlement agreement.

In the document entitled "Transfer of Interest in Personal Property," petitioner transferred her entire interest in the assets she held as tenant in common with her former husband as of the time of the divorce, including all income therefrom since the time of the divorce.

As noted earlier in this opinion, a "disposition" for purposes of section 47 includes a sale. Respondent contends that a sale occurred when petitioner's former husband exercised his election to purchase the property.

The issue to be decided is whether a sale of the business assets in question occurred before the close of 1967. We hold it did not.

The parties still had not agreed on substantial details of the sale at the close of 1967, for example, the precise date for payment of each

installment, security arrangements to insure petitioner receipt of the entire purchase price, and means for transfer of marketable title to the property. In fact, no such agreement was reached until December 15, 1972, when the parties entered into a Purchase and Settlement Agreement. The execution and delivery of the letter of October 18, electing to purchase petitioner's interest, was not self-contained, that is, was not immediately operative to divest petitioner of ownership. The letter itself and the subsequent conduct of the parties demonstrate quite clearly that both parties understood that more was required, that the letter was a demand on petitioner to negotiate and sign an agreement (as she eventually did in 1972), and that until then there was at most an "agreement to agree."

The election letter states, in relevant part, that Clifford Bockman "has elected, under the terms of the agreement, to purchase out the rights of the former Mrs. Bockman under a contract which would * * * be placed in escrow at the Ione State Bank, along with the necessary deeds and bills of sale, pending final payment of the purchase price of $25,000.00." Clifford Bockman's lawyer then demanded that a disputed sum of $1,000 "must be applied against the first year's payments, which will start to be paid monthly commencing November 1, 1967, if we can get an agreement prepared in time. * * * Needless to say, this is a capsule outline of what needs to be done, but in effect, it is also official notice of his election under the terms of the contract, *providing everything can be worked out as stated. * * * until Mrs. Hammerstrom agrees to some agreement*, a stop-payment has been placed against the $1,000.00 check and she will not be a signatory to the business accounts. * * * I am hopeful that now that the point of final contract has been reached, *that we can have a conclusion which will be acceptable*, if not satisfactory, to both parties. * * * I am willing to draw the contract, most of which charge then would be applicable to Mr. Bockman and you could then charge Mrs. Hammerstrom for any change you have in reviewing or in advice relative to the contract. * * * Also perhaps real estate and chattel mortgages with the same general ideas might prove better security." (Emphasis added.)

By its terms, the election was provisional. One thousand dollars remained in dispute, with petitioner's former husband insisting it be applied against the purchase price and making the election conditional upon her agreement to this point. A contract was contemplated, and suggestions were made regarding the security arrangements. On November 15, 1967, Clifford Bockman's lawyer again wrote: "I am authorized to advise that a check for $1,000.00 will be placed in my office immediately upon receipt of favorable word to the effect that Mrs. Hammerstrom is ready *to execute the necessary documents to place in*

*effect the agreement to purchase her interest by Mr. Bockman.*" It is impossible to avoid the conclusion that as of December 31, 1967, in the understanding of the parties and in fact, Mrs. Hammerstrom remained the owner of the property. The election having been made, she may have been under an obligation to dispose of her interest, but an obligation to dispose does not constitute a disposition. At year's end, it is clear that no "agreement on the final terms" had been reached, and no disposition, therefore, had occurred. "In order that there be sale for tax purposes there must be no less than a binding agreement that the title will be conveyed by the vendor to the vendee for a stated or determinable consideration payable in a specific manner. * * * As long as there was a 'squabble' going on * * * the transaction was contingent." *Dezendorf* v. *Commissioner*, 312 F. 2d 95, 98 (C.A. 5, 1963), affirming a Memorandum Opinion of this Court.

As of December 15, 1972, the parties entered into a binding agreement, the former husband paid the purchase price by cashier's check, and the petitioner transferred title to all the business assets as of the date of their divorce and assigned to her former husband all income from the business as of that date. Neither the retroactive date for passage of title (as of the date of the divorce) nor the assignment of income changes the date of sale. Cf. *2 Lexington Avenue Corp.*, 26 T.C. 816 (1956), acq. 1956–2 C.B. 8.

Respondent argues that the sale occurred on October 18, 1967, when petitioner's former husband exercised the option to purchase petitioner's interests in the business assets in that at that time petitioner's former husband, who held legal title to the property, "acquired sole possession of the business assets * * * in addition to assuming all the burdens and enjoying all the privileges of ownership." However, nothing can here be learned from the former husband's title, possession, or control, for in this case petitioner's former husband had at all relevant times had legal title, possession, and control of the assets, formerly as manager of the community property and thereafter under the terms of the property settlement agreement. On both occasions, however, he was required to act for the benefit not only of himself but also of petitioner, his coowner. He acquired nothing additional by way of title, possession, or control upon exercise of the option. Moreover, prior to entering into the Purchase and Settlement Agreement on December 15, 1972, he did not have the benefits and burdens or incidents of ownership of the property, in that under the property settlement agreement he was required to account monthly to petitioner and he and petitioner were to bear the losses and share the profits equally. The exercise of the election by Clifford Bockman merely resulted in an agreement to agree between the parties, and not an agreement of sale.

Inasmuch as we hold there was no sale of business assets by petitioner before the close of 1967, petitioner did not in 1967 dispose of section 38 property prematurely so as to trigger investment credit recapture under section 47(a).

*Decision will be entered under Rule 50.*

