BOLIN, Judge.
Pellets, Inc., engaged in the business of manufacturing, storing ■ and selling pellets made from coastal bermuda grass, sued its insurer, Millers Mutual Fire Insurance Company, for a loss allegedly caused by a fire in one of Pellets’ large storage tanks. Numerous parties were made third party defendants, including Central Electric and Machinery Company (CEMCO) and its liability insurer, American Insurance Company. Millers asked, in the event it was held liable, that it he granted judgment over and against CEMCO and American, alleging CEMCO constructed the manufacturing plant and installed the equipment for Pellets under a written contract, and if any fire damage occurred it was due to the faulty and negligent workmanship of CEMCO. This case was tried by a jury and all other third party demands were dismissed either before or during the trial. At the conclusion of a five-day trial the jury rendered verdict in favor of Pellets, Inc. against Millers Mutual Insurance Company for $71,750 plus penalties of 25% and attorneys’ fees of 25%. The third party demand of Millers against CEMCO and American was rejected. From judgment signed pursuant to the jury verdict Millers appeals.
Because of the number of litigants, the complexity of the pleadings and the fact the case was to be tried before a jury, it was agreed by all attorneys and the trial judge that the case would be tried in two parts. “Phase I” involved only the question of the liability of Millers to Pellets under the fire insurance policy. “Phase II” related only to the third party demands. An opening statement was made to the jury by the attorneys on each phase and all evidence was presented pertaining to Phase I before the opening statement or evidence was offered under Phase II. This made the case easier for the jury to understand and has facilitated this court in separating the issues. For this reason we shall follow the same procedure in writing our opinion.
PHASE I
During the early part of 1968, Pellets, Inc., began the operation of its plant in Morehouse Parish. On June 15, 1968, it secured a one-year insurance policy from Millers which, among other things, provided coverage against loss by fire to the maximum amount of $400,000 for stock and merchandise stored or situated in the steel tanks adjacent to the building. Pellets’ *552 product was rich in protein and vitamins and was used for feeding livestock. The process by which it was manufactured consisted of dehydrating and compressing coastal bermuda grass into small, hard pellets approximately 1/2" in length and ^/J' in diameter. These were stored in four large steel tanks, designated “A”, “B”, “C” and “D”, the tank here involved being 70 feet tall and SO feet in diameter. The grass pellets were placed in tanks from the top by means of a conveyer. In order to preserve the high vitamin content of the pellets and to lessen the possibility of fire by spontaneous combustion, inert (oxygen-free) gas was piped into the tanks.
In early December, 1968, Pellets discovered heat and vapor or smoke emanating from tank C and reported a possible fire to Millers. John Odom, vice-president of Millers, went to the plant in Morehouse Parish and, with the assistance of others, investigated the condition in tank C. As the result of this investigation Millers accepted the fact that a fire existed in this tank and paid Pellets for the loss. Mr. Odom, believing a similiar fire might occur in other tanks unless certain steps were taken to inhibit oxidation, decided to terminate the insurance policy. On December 16, 1968, Mr. Odom personally delivered to plaintiff’s representative a telegram, the pertinent portion of which reads as follows :
“Please be advised that this wire is given as your five day notice of cancellation of stock policy #EXA-3242192 issued by the Millers Mutual Fire Insurance Co. of Texas. This cancellation will become final at noon Standard time on December 21, 1968.
John Odom Vice Pres The Millers Mutual Fire Ins Co of Texas”
Soon after receiving the above telegram Pellets attempted to rectify the condition in tank A by pumping a chemical gas into the tank. Another telegram was sent to Pellets by Millers extending the purported cancellation from December 21st to January 2, 1969.
On December 28, 1968, an employee of Pellets observed what he considered to be possibly a fire in tank A, which, at that time, contained approximately 1750 tons of pellets. Millers was immediately notified by telephone and telegraph that a fire was suspected in tank A. Mr. Odom arrived at the plant on January 2nd with Mr. E. E. Taylor, but very little investigation was made by either of them at this time. Mr. Odom took the position the policy was can-celled effective January 2nd and, since no fire was visible on that date, he informed the mill manager Millers would assume no liability for the loss.
Mr. Taylor returned to the plant about January 6, 1969, and made some tests and concluded no fire existed in tank A. Mr. Taylor, who was accepted by the court as an expert in certain fields, admitted he had only investigated two cases involving fires in storage tanks similar to the one in question. We deem it unnecessary to go into all the details of the various tests made by Mr. Taylor. Suffice it to say he probed only 12 to 15 feet into the tank from the top and found the temperature to be 225° farenheit at a depth of approximately 15 feet. He did not probe deeper but it was his opinion there was no fire in the tank. He made no other investigation except to take some of the pellets back to his laboratory for more study.
Mr. Ron Snyder, an expert witness for Pellets, testified he was of the opinion a fire existed in tank A and that it was present as early as December 28, 1968, He further testified if the temperature was 225° farenheit at a depth of 15 feet in tank A, the temperature of the contents would increase proportionately from the top to the bottom. In any event, Mr. Odom made no further investigation. When he left the plant he instructed one of his employees to keep a constant watch on the tank and report to him if, and when, he saw any flame or glowing pellets.
*553 The condition of tank A grew progressively worse, and it was decided by Pellets to open a valve near the bottom of the tank and allow the contents to empty by gravity flow. On January 27, 1969, when the tank was less than half full, the first actual flame or glow from the bermuda pellets was noted and it was determined a hole should be cut in the bottom of the tank in order to empty it faster. When this was done a large pile of glowing embers came from the tank, at which time there could be no doubt a fire existed.
To determine the liability of Millers under its fire insurance policy it is first necessary to decide whether the two telegrams constituted a valid termination of the policy. The cancellation provision of the policy, which is in standard form, is in conformity with Louisiana Revised Statute 22:691, subd. F and provides:
it * * *
“This policy may be cancelled at any time by this Company by giving to the insured a five-days’ written notice of cancellation with or without tender of the excess paid premium above the pro-rata premium, for the expired time which excess, if not tendered, shall be refunded on demand. Notice of cancellation shall state that said excess premium- (if not tendered) will be refunded on demand.” (Emphasis added.)
It is admitted Millers gave no written statement to any representative of Pellets that the excess premium would be refunded. The insurance company took the position that its failure to comply with the cancellation provision was merely a technicality; that Pellets waived the compliance with the policy and the statute because it had knowledge of all the facts surrounding the notice of cancellation. Millers also shows premiums were refunded on February 20, 1969.
Millers has cited no Louisiana cases in support of its contention plaintiff waived the statutory provision. In the absence of any jurisprudence to the contrary the word “shall” appearing in the statute and in the insurance contract is mandatory, and in order for the cancellation to be effective the notice must state, in writing, the excess premium will be refunded on demand. The jurisprudence of this State is that an insurance company, relying upon the cancellation of its policy as a defense, bears the burden of proving every element necessary to establish a legal and effective cancellation of the policy in question has taken place. If the insurance company fails to prove every element necessary to a cancellation, the policy continues in full force and effect. Leger v. Lisonbee (La.App. 3 Cir. 1968), 207 So.2d 563; Anderson v. Fontenot (La.App. 3 Cir. 1964), 163 So.2d 366; Alexander v. State Farm Mutual Automobile Insurance Company, (La.App. 1 Cir. 1962), 148 So.2d 898; and Skipper v. Federal Insurance Company, 238 La. 779, 116 So.2d 520 (1959).
Millers’ defense of waiver of strict compliance with the cancellation provision was not set forth in the pleadings but is urged in brief before this court. The insurance contract and Louisiana Revised Statute 22:691 provides: “No * * * waiver of any provision [shall] be valid unless granted herein or expressed in writing and added hereto.” There is no contention here that such a written waiver took place and there is no showing of any intent by Pellets to waive any rights under its policy.
Having concluded the insurance policy had not been cancelled on January 2, 1969, and that an undisputed fire occurred in tank A on January 27, 1969, it necessarily follows Millers is liable for the damage occasioned by the fire.
On appeal appellant does not contend, should the finding of liability be affirmed, that the principal amount of recovery was incorrectly calculated to be $71,150.
Left for consideration under Phase I is whether the lower court was cor *554 rect in casting Millers with penalties and attorneys’ fees under Louisiana Revised Statute 22:658. In order to assess the insurer with these items it is necessary for the insured to show the insurer’s failure to pay was “arbitrary, capricious or without probable cause”.
If the jury was correctly charged as to the law, its decision on this portion of the case was based entirely upon its findings of fact. On this question the district judge charged the jury as follows:
“The law means by arbitrary, capricious and without just cause that the insurance carrier has acted unreasonably and in bad faith or without any real hope of success when it failed to pay the claim and that it, therefore, acted unreasonably and improperly and that they should have to pay an additional penalty for the delay caused its insured for the damage and for the attorneys’ fees incurred. It’s presumed that the insurance company had knowledge of all facts surrounding the loss and the attempted cancellation of the policy even though they may not claim to have known them.”
We find nothing in the jury charge that could be prejudicial to Millers. Therefore, the sole question relative to this portion of the award is whether it is so clearly unsupported by the record as to justify this court in overriding an obvious factual finding of the jury. We do not find this to be such a case and shall briefly set forth some of our reasons for so finding.
Mr. Odom had investigated and assumed payment for a fire for Pellets at the same plant, under the same policy, in a similar tank, under similar circumstances in early December, 1968. When he was notified of this second fire on December 27, 1968, he took no substantial steps until January 2, 1969, when he made only a cursory examination of tank A. However, he immediately informed a representative of Pellets he was assuming no responsibility for this fire. We can only conclude, as undoubtedly the jury did, that his decision was based on an erroneous conclusion of law that the insurance policy was effectively cancelled on January 2, 1969. Our conclusion on this point is fortified by the later actions of Mr. Odom and his experts in continuing to deny the existence of a fire in tank A until the man, employed to watch the tank constantly, informed them he saw glowing pellets erupt from the tank on January 27, 1969.
It is also pertinent, on the question of whether Millers’ refusal to pay was unreasonable, to note that it did not offer to pay the claim after January 27, 1969, but contented itself with refunding the excess premiums on February 20, 1969. Thus it appears obvious the insurance company’s refusal to pay was based on its mistaken belief the policy had been cancelled. As the insurer did not cancel its policy according to its own provision, and as it is charged with knowledge of the contents of its own policy, we do not feel justified in saying the jury was in error in finding it acted unreasonably and without probable cause.
Louisiana Revised Statute 22:658 provides “The amount of the penalty in each of the above cases shall be 25% and all reasonable attorneys fees.” Considering the nature of the case, the amount involved and the testimony of a practicing attorney as to his opinion of the value of the services rendered by plaintiff’s attorney, we find a fee of 25% of the amount recovered by plaintiff to be a reasonable fee.
For the reasons heretofore expressed, we conclude the jury’s findings as they relate to Phase I, to be correct.
PHASE II
The third party demand by Millers against CEMCO and American is pleaded in the alternative in the event Millers’ main defense is rejected. The third party demand is based on a provision of the policy and the general law of Louisiana which subrogates Millers to the rights of Pellets should the insurer be required to pay the claim under its fire insurance policy. As *555 Millers is substituted and figuratively-placed in the shoes of the subrogor, it is elementary Millers bears the burden of proving the fire was caused by some act or negligence on the part of CEMCO which would render it and American liable to Pellets for the damage.
The gist of Millers’ third party demand is contained in article 6 of its third party petition as follows:
“Third party plaintiff shows that, in the event it is cast in judgment to Pellets, Inc. for a loss under its policy, which loss was occasioned by fire, then the fire, and the resulting damage to the pellets in Tank A was caused by the negligence of Central Electric & Machinery Company, Inc. in the manner in which it constructed and designed Tank A, in the following non-exclusive particulars, to-wit:
“1. In improperly venting the tank and in failing to apply positive gauge pressure release valves and negative gauge pressure release valves.
“2. In failing to make the pellet conveyor into the tanks gas tight.
“3. In failing to make the inclined vari-speed screw conveyors from the tanks into the horizontal drag conveyor gas tight.
“4. In failing to properly pipe the inert gas into the tanks at more than one point.
“5. In failing to install several gas cocks so the inert gas could be analyzed at these points and to insure the gas being distributed through the tank evenly.
“6. In failing to install flow meters at each tank.
“7. In failing to install relief valves so the tanks could be sealed and made gas tight with at least two per tank.”
CEMCO and American answered and denied all charges of negligence. In addition, they alleged all plans and specifications were prepared in consultation with, according to the instructions of, and with the approval of authorized representatives of Pellets; that the work was completed and accepted by Pellets as conforming to the plans and specifications; that the managers and employees of Pellets were inexperienced in the operation of a pellet mill; that Pellets was contributorily negligent and assumed the risk of loss.
In order to put the issues between Millers and CEMCO, and its insurer, in proper perspective, it is necessary to discuss the written contract, dated October 17, 1967, and some of the events surrounding its execution. The pertinent provisions of the contract appear in the following paragraphs thereof:
“1. The Contractor shall furnish, install and erect the equipment and materials listed on the attached list marked Exhibit A to this contract on the described property located at- Mer Rouge, Louisiana hereinafter called the job site.
“Said equipment and materials as listed on Exhibit A hereto shall be constructed, erected and installed in a good, substantial and workmanlike manner, and in all respects in accordance with the local building codes, manufacturer’s specifications where applicable, and according to drawings to be furnished and approved by owner marked Exhibit B, in and about an existing building located on the afore-described job site property. The contractor shall also make the complete electrical installation for said equipment and said electrical installation shall be accomplished in a good, substantial and workmanlike manner and in accordance with local building codes, and attached specifications. (Emphases ours)
“2. The Contractor shall complete the installations, and shall remove all surplus materials, implements and rubbish off the premises by April IS, 1968, unless prevented by strikes, act of God, war, or other unavoidable consequences *556 and shall have plant in operation in said time unless prevented as aforesaid.”
Examination of the contract filed in evidence reveals the words “to be furnished and approved by owner” were handwritten into the contract in replacement of the printed words “attached hereto”. The latter two words were stricken and the change was initialed by an authorized agent of the contracting parties. This indicates a definite desire of the contracting parties to leave no misunderstanding that the specified items and conditions were subject to the owner’s approval.
Millers contends Item 9A of the specifications attached to the contract provide for the installation of an inert gas system and that the following condition under this item was not complied with by CEMCO:
“System to be connected to storage in proper manner for satisfactory service.”
The main thrust of Millers’ argument is that because the system was improperly connected to the storage tanks condensation occurred resulting in oxygen and water getting into the inert gas system. Mr. Taylor, the construction engineer who was offered by Millers as an expert in Phase I, was tendered by Millers as an expert to prove this latter contention. It was his opinion the system should have been connected to the storage tank in such a manner as to render the storage tanks airtight. He concluded spontaneous combustion was impossible in the absence of oxygen, and that oxygen would not have been present in-the tanks if the system had been properly constructed and installed. Mr. Taylor also considered the system deficient because of improper testing and measuring devices to indicate the flow of gas, to show whether the gas in the storage tanks sufficiently covered the pellets, and also to register the temperature within the tanks. Millers’ third party claim must stand or fall almost entirely upon the expert testimony of Mr. Taylor.
As a defense to Millers’ third party claim, CEMCO and American rely primarily upon the written contract and the attached exhibits. This contract required CEMCO to obtain and install certain items of equipment, including Heil dryers, a California pellet mill, a Jay-Bee hammer mill and a Kemp generator for the inert gas system. The work was to be done in two parts: (1) the installation of pellet machinery, and (2) the renovation of the existing feed mill. The total contract price was $376,764, of which $143,000 was for the purchase and installation of the Heil dryers, $60,000 for the pellet mill and $22,100 for the Kemp generator. The contract did not require CEMCO to do any design work or any engineering work. As previously pointed out the equipment to be used was specified in the exhibits attached to the contract, all of which had to be “approved by the owner”.
We have carefully examined the contract and exhibits and conclude it was not a “turnkey” job. For example, Pellets, Inc. was required to purchase and install the four storage tanks which were obtained from Rothschild in Shreveport, Louisiana, and CEMCO had no responsibility for the construction, condition or safety of these tanks.
Since the inert gas system seems to be the main bone of contention in the third party demand, it seems appropriate to point out what the obligations of CEMCO were with regard to its installation. The inert gas was formed by burning natural gas until all oxygen was removed therefrom. The gas was then cooled and piped into the storage tanks. Lay and expert witnesses testified inert gas is heavier than oxygen and when a sufficient amount is piped into a tank the oxygen is forced out through the top of the tank. The inert gas will then remain in the tank surrounding and blanketing the pellets so as to maintain the status quo of the pellets in the tank.
Millers contends the inert gas system could only be effective by making the storage tank airtight and controlling the air flow by pressure and relief valves, while CEMCO and American contend it would be effective by piping the inert gas in the bot *557 tom of the tank and allowing the oxygen to escape from the top. In our opinion Mr. Taylor was the only person who shared Millers’ conclusion on this point. The jury obviously did not believe Mr. Taylor either in Phase I or Phase II of this suit, and from our study of the record we are unwilling to say they were unwarranted in judging his credibility as a witness. We find no error in that portion of the jury verdict rejecting Millers’ third party demand against CEMCO and American.
For the reasons assigned the judgment is affirmed at appellant’s cost.