HERBERT E. WIESE and MARY C. WIESE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent PAUL H. ANDERSON and FRANCES M. ANDERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wiese v. Commissioner
Docket Nos. 7317-74, 7406-74.
United States Tax Court
T.C. Memo 1976-362; 1976 Tax Ct. Memo LEXIS 46; 35 T.C.M. (CCH) 1641; T.C.M. (RIA) 760362; November 29, 1976, Filed; As Amended Feb. 3, 1977. Theodore L. Jones,David Irvin Couvillion and Gregory A. Pletsch, for the petitioners. William A. Neilson, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioners' income taxes as follows: Docket No.
Petitioners
Year
Amount
7317-74
Herbert E. and Mary C.
1971
$68,777.00
Wiese
1972
31,058.00
7406-74
Paul H. and Frances M.
1971
64,123.12
Anderson
1972
27,063.96
Various issues having been settled by agreement *47 of the parties, there remains for decision only the question whether the section 1201 alternative tax rate of 25 percent applies to the capital gain petitioners realized upon the sale of their stock of H. E. Wiese, Inc. The 25 percent rate applies only if the sale was made pursuant to a binding contract entered into on or before October 9, 1969; otherwise the gain (in excess of $50,000 per joint return) would be taxed here at the rate of 32-1/2 percent in accordance with section 1201(c)(2)(B), I.R.C. 1954. FINDINGS OF FACT The parties have filed several stipulations of facts which, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Herbert E. Wiese and Mary C. Wiese, husband and wife, filed joint Federal income tax returns for the calendar years 1971 and 1972. Petitioners Paul H. Anderson and Frances M. Anderson, husband and wife, filed a joint Federal income tax return for the calendar year 1971. [1] Both couples resided in Baton Rouge, Louisiana, at the time they filed their petitions herein. *48 H. E. Wiese, Inc. ("Wiese, Inc."), a Louisiana Corporation, at all times pertinent hereto, was engaged, principally in the southern Louisiana area, in the construction of industrial plants for petroleum refining and petrochemical and chemical manufacturing. In addition, Wiese, Inc., was engaged in contract maintenance for industrial plants located in the same area. After March 27, 1969, Wiese, Inc., established an engineering department in connection with its construction and maintenance operations. On or before March 27, 1969, petitioner Herbert E. Wiese was president of, and petitioner Paul H. Anderson was a vice-president of, Wiese, Inc. Both men were members of its board of directors. On or before March 27, 1969, the stock of Wiese, Inc., was owned by the persons and in the proportions shown in the following table: Stockowner
Shares Owned
Percent
Herbert E. Wiese
2,350
31.34
Wiese Children and Spouses
1,400
18.66
Paul H. & Frances M. Anderson
2,625
35.00
A. K. McInnis
1,125
15.00
Total
7,500
100.00
The Pace Company Consultants and Engineers ("Pace"), a Texas corporation, at all times pertinent hereto, provided a wide range of engineering *49 and construction services to the petroleum refining, petrochemical and chemical industries. During 1968, Pace was interested in the acquisition of Wiese, Inc. In August of 1968, W. D. Broyles, a vice-president of Pace, moved to Baton Rouge to pursue negotiations for the acquisition of Wiese, Inc., and later to supervise the integration of the two companies as is more fully described below. On March 27, 1969, Pace and the Wiese, Inc. stockholders entered into a STOCK PURCHASE AGREEMENT and also a PLEDGE AND TRUST AGREEMENT. By the terms of the STOCK PURCHASE AGREEMENT, the Wiese, Inc. stockholders agreed to sell and Pace agreed to buy all the stock of Wiese, Inc. The selling price was approximately $3,800,000, payable partly in cash, partly in Pace stock, and partly in a Pace non-negotiable promissory note. Pace's obligation to purchase the Wiese, Inc. stock was made expressly subject to the condition, interalia, that there be a successful consummation of a public offering of Pace's common stock, through a firm underwriting, from which Pace expected to receive approximately $2,070,000. In language, the substance of which also appeared in the PLEDGE AND TRUST AGREEMENT, *50 the STOCK PURCHASE AGREEMENT recited: The purchase of * * * [Wiese, Inc.] stock * * * by Pace * * * is expressly made subject to the condition that Pace will within 135 days from the Closing Date [March 27, 1969] be able to have a firm underwriting * * * of a public offering of * * * Pace's * * * common stock * * *. If the public offering of Pace stock * * * is consummated, the purchase of the * * * [Wiese, Inc.] stock shall be final * * *. If the public offering of Pace stock * * * is not consummated, the purchase of the * * * [Wiese, Inc.] stock shall be deemed revoked and rescinded * * *. The PLEDGE AND TRUST AGREEMENT served to secure the rights of the respective parties to the STOCK PURCHASE AGREEMENT against various contingencies, including primarily, the possibility that the contemplated public offering of Pace common stock might not occur. Thus the STOCK PURCHASE AGREEMENT and the PLEDGE AND TRUST AGREEMENT together provided, in substance, that the Wiese, Inc. stock along with the consideration to be paid therefor, would on March 27, 1969, be transferred directly to the City National Bank of Baton Rouge, as Trustee. The Wiese, Inc. stock was to be transferred *51 to the Trustee's name, as follows: "City National Bank of Baton Rouge, Trustee under Pledge and Trust Agreement dated [March 27], 1969. But all dividends distributed in respect of this Wiese, Inc. stock held by the Trustee, were to be paid directly to Pace. In connection with the planned public offering of common stock, Pace filed, with the SEC, a Form S-1 Registration Statement including a preliminary prospectus dated April 1, 1969. This filing contained relevant business and financial data of both Pace and Wiese, Inc.Both companies incurred substantial costs to develop this information required by the SEC. However, as is hereinafter more fully described, the contemplated public offering did not take place before the end of the originally specified time period or of any extension thereof. After March 27, 1969, the organization and business operations of Wiese, Inc. were increasingly influenced by Pace. Pursuant to the March 27, 1969, agreements, the following significant personnel changes were made at Wiese, Inc.: The board of directors was increased to seven members, including four Wiese, Inc. men and three Pacemen. H. E. Wiese, Paul Anderson, and A. K. McInnis resigned *52 as directors and were replaced by other Wiese, Inc. employees. Mr. Wiese and Mr. Anderson remained the principal officers of the corporation, but A. K. McInnis was no longer employed there. The March 27, 1969, agreements further provided for the creation of a two-member "Supervisory Committee", whose unanimous consent was required for Wiese, Inc., to undertake certain major business activities. Mr. Wiese and Warren E. Askey, then President of Pace, were named as the two members of the Committee. In connection with the March 27, 1969, agreements, Mr. Wiese and Mr. Andersn entered into employment agreements which would have had the effect of reducing substantially the salary and bonus compensation that each of them had enjoyed prior to that date. For the fiscal year ended February 28, 1969, Mr. Wiese received remuneration of approximately $182,458, and Mr. Anderson received remuneration of approximately $130,717. Subsequent to March 27, 1969, the salary to be paid to each man, pursuant to this new employment contract was as follows: Mr. Wiese was to be paid a salary of $31,200 per annum, for a term ending September 30, 1971; and Mr. Anderson was to be paid a salary of $26,000 *53 per annum, for a term ending February 28, 1974. Each man was also to participate in bonuses payable under a new incentive compensation policy which was to be adopted with respect to Wiese, Inc. On the basis of the salaries provided under the employment contracts for Messrs. Wiese and Anderson, and further on the basis of the estimated earnings of Wiese, Inc., for the fiscal year ended February 28, 1969, it was estimated that the total compensation (salary plus bonus under the proposed new incentive compensation policies) which each man would have received for that year would have been as follows: Mr. Wiese, $75,000; and Mr. Anderson, $70,000. As a result of these changes, the compensation of these two men would have been more nearly commensurate with that received by other Pace executives. The reduction also was supposed to reflect their lessened work-load and decreased responsibilities. However, the record does not disclose the amount of compensation which each man actually received for 1969. See infra, p. 16. As part of the integration of the business activities of Wiese, Inc., and Pace, an engineering design group was established within the Wiese, Inc. organization. *54 This group was created by the transfer, in July, 1969, of Pace's existing Process Design Group to Wiese, Inc. The transferred group consisted of a director of engineering and six project managers and engineers. These seven persons became employees of Wiese, Inc. and their salaries for the period beginning July 1, 1969, and ending December 31, 1971, were paid by Wiese, Inc., in the amounts shown in the following table: 1969
1970
1971
R. E. Rimkus
$10,710.00
$34,001.58
$29,061.09
J. A. Askins
9,492.00
17,986.00
20,876.00
L. E. Reisner
6,704.13
14,346.00
15,249.20
R. D. Ostermiller
8,140.00
5,640.00
-0-*
K. D. Brenton 10,168.00
6,768.00
-0-*
D. P. Moore
7,940.00
5,880.00
-0-*
E. H. Carpenter
10,644.00
21,680.00
25,534.54
TOTAL
$63,798.13
$106,301.58
$90,720.83 Any profits resulting from the work of the engineering group belonged to Wiese, Inc. However, although it was in all these respects integrated into Wiese, Inc., the group remained under the supervision of Mr. Broyles, who was at all times a Pace employee. After the initial transfer of these seven employees, Pace supervised *55 the hiring of an additional 40 persons for the engineering group of Wiese, Inc. These 40 people included draftsmen as well as civil, structural, instrument, mechanical, chemical and electrical engineers. It cost approximately $5,000 in addition to regular salary and benefits to hire each engineer. Thise cost was borne by Wiese, Inc.
The establishment of this engineering division necessitated the expansion of Wiese, Inc.'s administrative office and parking facilities and the relocation of the corporation's equipment, tool and repair shops. In making these adjustments, on the basis of Pace's recommendations, Wiese, Inc., incurred costs of between a quarter and a half million dollars. The transfer of the seven engineers from Pace to Wiese, Inc., had the effect of reducing Pace's net income by approximately $30,000 annually. Thus, on the basis of the March 27, 1969, agreements, the two companies incurred substantial costs in connection with the proposed public offering of the Pace stock, the reorganization and expansion of Wiese, Inc., and the partial integration of the two businesses in contemplation of the final acquisition of Wiese, Inc., by Pace. Around July, 1969, Pace *56 encountered certain business problems which, along with the generally unfavorable stock market conditions then existing, decreased the likelihood that the contemplated public offering of Pace stock would have been successful. By September, 1969, it appeared that the price of the Pace stock would have to be reduced by as much as 50 percent if the offering were to be completed. Under the circumstances, Pace's management concluded that it would be unwise to proceed with the public offering. Therefore, on or about October 6, 1969, Pace officially notified Wiese, Inc., of its decision to withdraw the public offering; and on October 13, 1969, Pace applied to the SEC for the withdrawal of its registration statement. The adverse conditions described above led the parties to the March 27, 1969, agreements to modify those agreements in certain respects. First, on August 12, 1969, Pace and the Wiese, Inc. stockholders agreed to extend the PLEDGE AND TRUST AGREEMENT until November 12, 1969. Second, on September 22, 1969, the same parties, with the consent of the Trustee, agreed to the "FIRST AMENDMENT" to both the STOCK PURCHASE AGREEMENT and the PLEDGE AND TRUST AGREEMENT. This amendment, *57 in substance, permitted Pace to withdraw the Cash Consideration it had deposited with the Trustee on March 27, 1969. This withdrawal allowed Pace to save the interest expense it was incurring to borrow those funds. Finally, on September 26, 1969, the same parties agreed to an "ADDENDUM" to the FIRST AMENDMENT. The ADDENDUM was executed to clarify technical provisions and instructions to the Trustee contained in the FIRST AMENDMENT. In spite of Pace's difficulties, both Pace and the Wiese, Inc. stockholders hoped to complete the sale of Wiese, Inc., to Pace. Both sides still believed that the two companies could operate more profitably if they were part of a single corporate group. Moreover, each party recognized that substantial amounts had been spent in contemplation of the proposed acquisition, and that additional costs would be incurred in separating the companies' already somewhat integrated business operations, in the event that the acquisition plans were abandoned. Therefore, several meetings between representatives of Pace and some of the Wiese, Inc. stockholders were held during the early part of October, 1969. On or about October 8, 1969, Messrs. Askey and Broyles, *58 of Pace, met with the principal stockholders of Wiese, Inc., namely, Mr. Wiese, Mr. Anderson and A. K. McInnis. They discussed the problem of consummating the acquisition in light of the fact that the public offering of Pace common stock would not take place. Several alternative plans were discussed. Eventually, the parties decided that the best way to complete the deal was for the Wiese, Inc. stockholders to grant Pace an option to buy their stock. It was contemplated that this option would extend for approximately two years and that during this two-year period, Pace would raise the money needed to make the purchase. After this meeting, Mr. Wiese wrote the following letter, dated October 8, 1969, to Mr. Askey: This letter is written to confirm* the agreement A. K. McInnis, Paul Anderson and the writer reached with you on your last visit to Baton Rouge. [Paragraph two rejects use of a private placement of Pace stock in lieu of the public offering, and also rejects the possibility of Pace and Wiese, Inc., working together on a joint *59 venture basis.] We (A.K., Paul and I) therefore made this counter proposal: 1. Wiese is to go back to its old method of operating, particularly the old bonus plan for its officers including the percentage proposed for the new officers elected during the period Wiese anticipated the completion of the merger with Pace. 2. Paul, A.K. and I would be re-elected to the Wiese Board of Directors * * *. 3. The profits or loss of the new H. E. Wiese, Inc. Engineering Department would be included in the total Wiese profit picture upon which the officers' Bonus and profit sharing are based. 4. In return for the above all parties agreed that the price of Wiese stock to Pace and the method of payment to the Wiese Stockholders would remain the same as shown on the Pledge and Trust Agreement Exhibit B and Exhibit C, provided the first down payment could be made by Pace prior to October 15, 1971. The date of the first note payment and the interest rate was not mentioned in our verbal conversation. However, Wiese Stockholders request that the new agreementwhen consummated $3 read the existing prime rate of interest on the date the agreement is signed instead of 6% agreed *60 upon in the old document. On October 24, 1969, Mr. Wiese and Mr. Askey met with the attorney for the Wiese, Inc. stockholders. They instructed him to prepare formal written instruments based on the discussion which had taken place at the October 8, 1969, meeting. The status of the Wiese, Inc. acquisition plans was discussed at the regularly scheduled meeting of the Pace board of directors, held on October 27 and 30, 1969. According to the minutes of the October 27, 1969, portion of the meeting: W. E. Askey stated that since our registration had been withdrawn,* it would be necessary to dissolve the agreement with H. E. Wiese, Inc. shareholders to permit the return of 41,300 shares of the Common Stock of The Pace Company Consultants & Engineers to the Corporate Secretary, and the return of the H. E. Wiese, Inc. stock to its shareholders. Upon motion duly made and seconded, the following resolution was adopted: RESOLVED, that the actions of W. E. Askey in behalf of The Pace Company Consultants & Engineers in dissolving the pledge and trust agreement between The Pace Company Consultants & Engineers, the H. E. Wiese, Inc. shareholders, and City National Bank *61 of Baton Rouge are hereby approved and ratified. W. E. Askey stated that he would need Board approvalto negotiate an option with the shareholders of H. E. Wiese, Inc. for the purchase of their stock. Upon motion duly made and seconded, the following resolution was adopted: RESOLVED, that W. E. Askey is hereby authorized to negotiate an option with the shareholders of H. E. Wiese, Inc. for the purchase of their stock, and that the option should be for a two year period and should be in substantial compliance with the terms of the original purchase agreement with the shareholders of H. E. Wiese, Inc.
Then when the meeting was reconvened on October 30, 1969, Mr. Askey read to the board the letter dated October 8, 1969, which he had received from Mr. Wiese. On November 6, 1969, Mr. Askey, each of the Wiese, Inc. stockholders, and a representative of the Trustee named by the March 27, 1969, PLEDGE AND TRUST AGREEMENT, signed an agreement which provided in relevant part that: WHEREAS, said above described Stock Purchase *62 Agreement and Pledge and Trust Agreement were amended by instrument dated September 22, 1969, (and Addendum dated September 26, 1969), which is made a part hereof by reference, and, WHEREAS, the Sellers & Payee-Settlors and Pace have now agreed to terminate, cancel and discontinue both the Stock Purchase Agreement and the Pledge and Trust Agreement, therefore, the parties agree, as follows: 1. The Stock Purchase Agreement dated March 27, 1969, as extended and amended, is hereby terminated and cancelled. 2. The Pledge and Trust Agreement dated March 27, 1969, as extended and amended, is hereby terminated and cancelled. Also by this document, the Trustee was directed to return to the respective contracting parties the consideration (i.e., Wiese, Inc. stock certificates, Pace stock certificates, and the Pace promissory note) which each had contributed and which was then being held by the Trustee pursuant to the conditions of the March 27, 1969, agreements. Six days later, on November 12, 1969, Pace and the Wiese, Inc. stockholders signed the "OPTION TO PURCHASE STOCK" agreement contemplated by their October discussions. This document provided in part as follows: AGREEMENT *63 made November 12, 1969, * * *. * * *
NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, the parties agree as follows: 1. Sellers hereby grant to Pace an option to purchase all the issued and outstanding capital stock of H. E. Wiese, Inc. for * * * ($3,800,000.00) DOLLARS. [Payable $1,007,000 in cash at the exercise of the option and $2,793,000 in 5 equal annual installments.] The unpaid balance shall bear interest, payable annually, at the prime rate received by the banks in the City of Baton Rouge at the time the option is exercised. * * *
3. * * *
The payment of the note consideration referred to hereinabove shall be secured in the same manner as provided for in the Stock Purchase Agreement and the Pledge and Trust Agreement dated March 27, 1969 * * * or some other method of securing the payment of the note agreeable to the Sellers. * * *
This option shall terminate October 15, 1971, unless the cash downpayment referred to hereinabove is made on or before that date. Sellers agree recognition of this option agreement will be noted on the shares of stock issued by the corporation. Pursuant to these agreements, *64 but on a date not established in the record, the Wiese, Inc. stock certificates were returned to their original owners. The stock certificates were not introduced in evidence at the trial herein; nor was their absence explained.
Certain changes in the management of Wiese, Inc. occurred as a result of the October, 1969, discussions and the November, 1969, agreements. Mr. Wiese, Mr. Anderson, and A. K. McInnis were returned to the Wiese, Inc. board of directors; and bonus compensation of Wiese, Inc. officers was again to be determined using the pre-March 27, 1969, formula. However, apart from these changes, the business operations of the two companies in the Baton Rouge area, went on as they had since the summer of 1969. Wiese, Inc's new engineering department continued working under the supervision of W. D. Broyles of Pace. And, although the Supervisory Committee established by the March 27, 1969, STOCK PURCHASE AGREEMENT no longer functioned as a formal entity, Mr. Wiese continued the practice of consulting with Mr. Askey before Wiese, Inc., would undertake jobs in excess of half a million dollars. During 1970 the Internal Revenue Service examined the corporate income tax *65 liability of H. E. Wiese, Inc., for its three fiscal years ending February 29, 1968, February 28, 1969, and February 28, 1970. The examining revenue agent proposed a number of adjustments, one of which was the disallowance of the deduction claimed for certain "legal and accounting" fees paid by the corporation in connection with the planned acquisition of Wiese, Inc., by Pace. The agent recommended these deductions be disallowed on the grounds that, as of October 2, 1970 (the date of the Revenue Agent's report): The proposed transaction has been amended and the option to buy extended but has not been abandoned. * * * Until the plans are abandoned, it appears all these expenses should be capitalized. However, the record indicates that in the administrative process involved in reviewing the proposed deficiency consideration might also have been given to an alternative ground for disallowing the deduction, namely, that the expenses were incurred for the benefit of the selling stockholders rather than for the corporation. In response to the adjustments proposed by the IRS, H. E. Wiese, Inc., filed a letter of protest. This letter was prepared by Hannis T. Bourgeois, a CPA and *66 was executed under penalty of perjury by Mr. Wiese, as president of the corporation. In that protest letter, Mr. Wiese objected to the examining agent's conclusion in respect of the legal and accounting fee deduction, with the following statement: The Pace agreement terminated on November 6, 1969, as evidenced by a release executed to the bank bearing that date, and a letter from the bank to that effect dated December 2, 1970. After that transaction had been completed, terminated, and closed, on November 12, 1969, a new option agreement was entered into by and between the stockholders of Wiese and Pace, which had nothing to do with the previous negotiations. The corporation's income tax liability dispute, which involved a number of items apart from the claimed deduction for the legal and accounting fees, was eventually settled by agreement of the parties. In that settlement, it does not appear that any deduction was allowed for these fees. On or about June 30, 1971, Pace and the Wiese, Inc. stockholders entered into an agreement entitled: "SUPPLEMENT TO OPTION TO PURCHASE STOCK". This agreement [2] provided: WHEREAS under the AGREEMENT made November 12, 1969, entitled "Option *67 to Purchase Stock" * * * Pace was given an option to purchase all of the * * * capital stock of H. E. Wiese, Inc. * * *
NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and in said Agreement, the parties hereby agree * * * as follows: I In addition to the option provided for in paragraph numbered "1" of said Agreement, Pace shall also have the option, at its sole election, to purchase all of the issued and outstanding shares of capital stock of H. E. Wiese, Inc. for the * * * total cash consideration of [$3,500,000].
* * *
II As herein supplemented and modified * * * said Agreement shall continue in full force and effect. EXECUTED in duplicate originals this 30 day of June, 1971, but effective as of November 12, 1969. *68 On October 18, 1971, Pace and the Wiese, Inc. stockholders entered into a final "STOCK PURCHASE AGREEMENT". This agreement provided: AGREEMENT made and entered into as of July 1, 1971 * * *. * * *
1.Purchase and Sale [The Wiese, Inc. stockholders agree to sell and Pace agrees to buy all the stock of Wiese, Inc.] It is agreed by and between Sellers and Pace that such sale and purchase of said shares of stock shall be effective as of the close of business on June 30, 1971. 2. Consideration and Payment. The total purchase price of the 7,500 shares of Company stock being purchased is $3,500,000.00. The per share purchase price of the individual shares is $466.6666 per share. The purchase price of the shares shall be paid on the Closing Date by Pace's delivery of the cash consideration set forth on said Exhibit A for each of the respective Sellers. 3. Closing Date. The closing of the transactions provided for in this Agreement shall be held at 11:59 o'clock A.M. Baton Rouge time, on October 15, 1971 * * * or at such other * * * time as [the parties] by mutual agreement shall designate. Although this second (and final) STOCK PURCHASE AGREEMENT recited *69 that it was "made and entered into as of July 1, 1971", it was in fact executed on October 18, 1971. Insofar as can be determined from the record, the transaction was also closed on that same day, October 18, 1971. And it was from this transaction that the Wiese, Inc. shareholders realized the gain which is the basis of the present controversy. The Commissioner determined a deficiency in each petitioner's income taxes on the grounds that: [For] purposes of computing alternative tax under Section 1201 * * *, the capital gain * * * realized in 1971 from your sale of stock of H. E. Wiese, Inc. did not emanate from a binding contract entered into on or before October 9, 1969. Therefore, this gain is not a "subsection (d) gain" as defined in Section 1201(d) * * * and tax computed at the rate of 32-1/2% applies to that portion of the gain in excess of $50,000.00 rather than the rate of 25% used in the return as filed. Petitioners, on the other hand, assert that the sale of the stock to Pace, was made pursuant to a binding contract which had been entered into by petitioners prior to October 9, 1969, and said contract was in existence and in effect on October 9, 1969, prior *70 and at all times subsequent to said date until consumation [sic] of the transfer on July 1, 1971; * * *. OPINION Section 1201(b), I.R.C. 1954, imposes an "alternative tax," on individuals. If the section as a whole is applicable, it provides, in part, that certain long-term capital gains will be taxed at the rate of 25 percent. As a result of certain modifications of the Code made by the Tax Reform Act of 1969, 83 Stat. 487, this 25 percent rate applies only to those long-term capital gains which constitute "subsection (d) gain" as defined in section 1201(d). Long-term capital gains in excess of the "subsection (d) gain" are taxed at the higher rates specified in section 1201(c). Prior to the 1969 changes, where the alternative tax was applicable, it provided in effect, that all long-term capital gains of non-corporate taxpayers were to be taxed at the rate of 25 percent. In one of its efforts at "reform", Congress enacted section 511 of the Tax Reform Act of 1969, 83 Stat. 635, which *71 increased the rates at which some capital gains were to be taxed. In substance, the new provisions, which were made applicable to taxable years beginning after December 31, 1969 (sec. 511(d), 83 Stat. 638), retained the 25 percent rate only with respect to the first $50,000 of an individual's long-term capital gains. However, to mitigate the impact of this change, Congress undertook to preserve the 25 percent rate -- without the application of the $50,000 limitation -- also for those gains which it viewed as sufficiently connected to pre-October 9, 1969, transactions. This result was achieved legislatively through the complex provisions of section 1201(b), (c) and (d), whereby the gains described in section 1201(d) were in effect given the benefit of the 25 percent rate. The operation of the statute turned upon a new concept defined therein as "subsection (d) gain". Petitioners realized long-term capital gains substantially in excess of $50,000 in 1971 from the sale of their H. E. Wiese, Inc. stock. Thus, since these gains were realized after 1969, the portions thereof in excess of $50,000 would be subject to the new higher rates, unless they qualified as "subsection (d) [gains]. *72 " And the critical question before us is whether the gain in question meets the test of section 1201(d)(1)[3] as, amounts received before January 1, 1975, from sales or other dispositions pursuant to binding contracts * * * entered into on or before October 9, 1969, * * *. A "binding contract" is defined by section 1.1201-1(f)(2), Income Tax Regs., as follows: (i) A binding contract entered into on or before October 9, 1969, means a contract, whether written or unwritten, which on or before that date was legally enforceable against the taxpayer under applicable law. If on or before October 9, 1969, a taxpayer grants an irrevocable option or irrevocable contractual right to another *73 party to buy certain property and such other party exercises that option or right after October 9, 1969, the sale of such property is a sale pursuant to a binding contract entered into on or before October 9, 1969. * * * (ii) A contract which pursuant to subdivision (i) of this subparagraph constitutes a binding contract entered into on or before October 9, 1969, does not cease to qualify as such a contract by reason of the fact that after October 9, 1969, there is a modification of the terms of the contract such as a change in the time of performance, or in the amount of the debt, or in the terms and mode of payment, or in the rate of interest, or there is a change in the form or nature of the obligation or the character of the security, so long as the taxpayer is at all times on and after October 9, 1969, legally bound by such contract. * * * (Emphasis supplied.) The parties have assumed that "applicable law" in this case is the law of the State of Louisiana, and there is nothing in the record before us to suggest that the law of any other state should be applied instead. Therefore, we look to Louisiana law to determine the legal effects of the relationship between petitioners, *74 as sellers of the Wiese, Inc. stock, and Pace, as the buyer of that stock. At the outset, it must be remembered that petitioners actually realized their gain pursuant to the STOCK PURCHASE PROVIDE TWO ALTERNATIVE ROUTES FOR MAKING THAT CONNECTION. However, on the basis of the record before us, we hold that the October 18, 1971, STOCK PURCHASE AGREEMENT: (1) agreement/ entered into on October 18, 1971, more than two years after the cut-off date specified by section 1201(d)(1). Thus,1to prevail, they must establish a statutorily acceptable connection between this contract and some legally enforceable agreement in effect on or before October 9, 1969. The regulations quoted above did not result from Pace's exercise of a pre-October 9, 1969, "irrevocable option or irrevocable contractual right" to buy the Wiese, Inc. stock, and (2) was not a "modification" of a contract which was entered into on or before October 9, 1969, and which was at all times thereafter legally binding. Cf. David Sartori,66 T.C. 680. Therefore, petitioners did not realize "subsection (d) gain" in excess of that provided for by section 1201(d)(3). Petitioners have suggested a variety of *75 alternative theories to support the proposition that the October 18, 1971, contract was adequately connected to a pre-October 9, 1969, agreement. Each of these theories emphasizes different aspects of the complex legal and business relationships which developed between Wiese, Inc., and Pace during the nearly three years from the beginning of negotiations until the acquisition was completed. To simplify analysis and to avoid unnecessary repetition, we set forth immediately below, our interpretation of and our legal conclusions about, three important aspects of the record. Once this is done, the proper application of the regulations will be plain. In the first place, negotiations for the acquisition of Wiese, Inc., evidently began in late 1968. However, we cannot find that these negotiations resulted in an oral agreement before March 27, 1969, which could be considered a "binding contract" within the meaning of the regulations. In this regard we note particularly (1) the minutes of the February 24, 1969, Pace board of directors meeting, which contain the resolutions authorizing the purchase of the Wiese, Inc. stock, and (2) the text of the March 27, 1969, documents themselves. *76 Certainly, the terms of the March 27, 1969, agreements were settled upon by the parties before the documents were executed. However, it is our conclusion from the record before us that the parties understood and intended that they would not be legally bound by their discussions until the written documents were signed. Thus, before that time, no legally enforceable contract for the sale of the Wiese, Inc. stock to pace, came into existence. Breaux Brothers Construction Company v. Associated Contractors, Inc.,226 La. 720, 727; 77 So. 2d 17, 20; Laroussini v. Werlein,52 La. Ann. 424, 27 So. 89; Big "A" Sand & Gravel Co., Inc. v. Bay Sand & Gravel Co. Inc.,282 So. 2d 837, 840-843, writ refused 284 So. 2d 773; Sterkx v. GravityDrainage District No. 1 of Rapides Parish, La.,241 So. 2d 552, writ refused 252 La. 964, 215 So. 2d 130. Secondly, the negotiations referred to above culminated in the execution of the March 27, 1969, STOCK PURCHASE AGREEMENT and *77 PLEDGE AND TRUST AGREEMENT, which were subsequently extended and amended. [4] Then, on November 6, 1969, the Wiese, Inc. stockholders, Mr. Askey of Pace, and a representative of the bank Trustee, signed an AGREEMENT which states that it "terminated and cancelled" both March 27, 1969, agreements "as extended and amended". Petitioners have presented considerable evidence and argument in an effort to convince us that the November 6, 1969, AGREEMENT had a more limited effect. [5] Petitioners contend that this document was designed merely "to get * * * the bank trustee out of the picture" (i.e., to rescind the escrow arrangements created by the PLEDGE AND TRUST AGREEMENT), and to permit the "conversion" of the March 27, 1969, agreements into an option contract. As additional support for this claim, petitioners have called our attention to the circumstances of the uninterrupted business relationship between Pace and Wiese, Inc.
*78 Notwithstanding petitioners' earnest presentation, it is plain from the record as a whole, that upon the execution of the November 6, 1969, AGREEMENT, the parties ceased to be bound by the March 27, 1969, agreements. [6] The text of the November 6, 1969, document is explicit, unambiguous and precisely suited to its apparent purpose. Moreover, Mr. Wiese's testimony that this document "didn't do anything" to the deal with Pace is substantially weakened by his prior inconsistent statement to the Internal Revenue Service, quoted supra, p. 18. [7] We do not suggest that this November 6, 1969, document meant that the parties had abandoned their plans for the acquisition of Wiese, Inc., by Pace. To the contrary, it is actually realized their gain pursuant to the STOCK PURCHASE agreements of March 27, 1969, and their mutual decision that, as of November 6, 1969, they would no longer be 1201(d)(1). Thus, to prevail, they must establish *79 Finally, to complete this preliminary overview we consider the October 8, 1969, meeting between representatives of Pace and Messrs. Wiese, Anderson, and McInnis. At that meeting, the parties discussed various alternative plans for the acquisition of Wiese, Inc., by Pace, given the fact that the public offering of Pace common stock would not take place, thereby rendering the March 27, 1969, agreements inoperative. Among the plans discussed was one whereby Pace would be given an option to buy the Wiese, Inc. stock. However, the Wiese, Inc. stockholders did notatthatmeeting grant Pace "an irrevocable option or irrevocable contractual right" to buy the stock of Wiese, Inc. Instead, the parties agreed, at most, on certain of the terms to be contained in an option to which they planned to commit themselves at some future time. [8] Thus, as with the pre-March 27, 1969, discussions, the Wiese, Inc. stockholders did not intend to be, and were not, legally bound until the written AGREEMENT of November 12, 1969, was signed. Breaux Brothers Construction Company v. Associated Contractors, Inc.,supra; *80 Laroussini v. Werlein,supra;Big "A" Sand & Gravel Co. Inc. v. Bay Sand & Gravel Co. Inc.,supra;Sterkx v. GravityDrainage District No. 1 of Rapides Parish, La.,supra.
*81 With the conclusions stated above in mind there can be no doubt that the STOCK PURCHASE AGREEMENT of October 18, 1971, does not constitute a binding contract entered into on or before October 9, 1969, within the meaning of section 1201(d)(1). We consider each potentially applicable section of the regulations in turn. In the first place, petitioners have not shown that the STOCK PURCHASE AGREEMENT of October 18, 1971, resulted from the exercise by Pace of an irrevocable option within the scope of section 1.1201-1(f)(2)(i) of the regulations. To be sure, there existed an OPTION TO PURCHASE STOCK agreement, made November 12, 1969, and also a SUPPLEMENT TO OPTION TO PURCHASE STOCK agreement, made June 30, 1971. However, neither of these agreements was effective on or before October 9, 1969. They are not modifications of a pre-March 27, 1969, legally binding oral agreement, because there was no such legally binding oral agreement. For the same reason, they are not simply the written embodiment of an oral option supposedly granted on October 8, 1969. Moreover, the first written option was not executed until November 12, 1969, six days after the March 27, 1969, agreements were terminated. *82 Therefore, even though the parties might have regarded that option as a "modification" or "conversion" of the March 27, 1969, agreements, those agreements no longer had any vitality on November 12, 1969. Consequently, the option agreement executed on that day could not, by virtue of its supposed relationship to the March 27, 1969, agreements, qualify as an irrevocable option granted on or before October 9, 1969. Furthermore, by the explicit terms of the November 12, 1969, agreement, petitioners were bound by these options only until October 15, 1971. [9] Yet the STOCK PURCHASE AGREEMENT by which petitioners sold their Wiese, Inc. stock, was not executed until October 18, 1971. [10] And petitioners have presented no evidence that any option was exercised prior to October 15, 1971, by some action other than the execution of the STOCK PURCHASE AGREEMENT.Once October 15, 1971, passed without any option having been exercised, petitioners were no longer legally obligated by these options to sell their stock to Pace. Standard Oil Co. of Louisiana v. Milholland,167 La. 707, 120 So. 59; *83 Barchus v. Johnson,151 La. 985, 92 So. 566; cf. Thibodeaux v. Zigler,121 So. 2d 296 (La. App.). *84 Nor was the October 18, 1971, STOCK PURCHASE AGREEMENT merely a "modification" of some pre-October 9, 1969, contract by which petitioners were "at all times on and after October 9, 1969, legally bound", within the meaning of section 1.1201-1(f)(2)(ii), Income Tax Regs. Quite simply, there was no such pre-October 9, 1969, contract. Neither a pre-March 27, 1969, legally binding oral contract, nor an October 8, 1969, legally binding oral option, existed. The March 27, 1969, written agreements were terminated on November 6, 1969, and, the written options lapsed no later than October 15, 1971. Thus, in spite of the wide variety of theories which they have presented, petitioners have not established that the gain in question was realized pursuant to a binding contract entered into on or before October 9, 1969, as required by the statute. However, in conclusion we must consider two additional contentions raised by the petitioners. They, first of all, suggest that the "treatment as is proposed by respondent is a denial of due process" violative of their constitutional rights. We quote petitioners' argument in support of their Fifth Amendment claim: *85 The arbitrary selection of a retroactive date in the transitional rule should not be applied to penalize a transaction which had been legitimately negotiated prior to enactment of Section 1201(d). Such treatment would be discriminatory, arbitrary and capricious and would result in substantial differences in the tax burden while maintaining no uniformity. There are two short answers to this claim. One is that the provisions under attack are far from arbitrary and it has been firmly established that Congress may constitutionally enact such "retroactive" income tax legislation. Reinecke v. Smith,289 U.S. 172, 175; Lynch v. Hornby,247 U.S. 339, 343; Brushaber v. Union Pacific R. Co.,240 U.S. 1, 20; Albert L. Dougherty,60 T.C. 917, 929; David O. Rose,55 T.C. 28, 31. The second is that petitioners here have not in fact been subject to the retroactive application of the 1969 statute. They realized the gain in question during 1971, as a result of their action on October 18, 1971. Finally, *86 petitioners claim that since the sale was in fact carried out, the Commissioner, lacking privity of contract, may not establish that the various contracts entered into for the purpose of making the sale were in one respect or another legally defective and therefore unenforceable. In response, suffice it to say that petitioners' tax liability depended not only upon the actual completion of the sale, but also upon whether the sale was made pursuant to a contract which, on and at all times after October 9, 1969, was "legally enforceable against the taxpayer under applicable law". Therefore, the Commissioner may point out those factors which might have made the various agreements unenforceable, not for the purpose of setting the transaction aside, but for the purpose of determining the correct tax liability resulting from the transaction. We add one more thought. Congress, through the Tax Reform Act of 1969, deliberately increased the tax on capital gains (in excess of $50,000) realized after 1969. At the same time it recognized that some sales which had been arranged or negotiated prior to the end of 1969 would not be consummated until after 1969, and it undertook to provide for *87 the continuance of the old 25 percent rate in respect of some, butnotall, of them. Congress drew a firm line to define those sales which could produce gains eligible for the 25 percent rate; it required that such sales must be "pursuant to binding contracts * * * entered into on or before October 9, 1969." There is no doubt that petitioners' sale of their Wiese, Inc. stock was in many ways connected to events which occurred prior to October 9, 1969, and that these connections very nearly satisfy the conditions imposed by section 1201(d)(1). However, it is equally plain, that as tantalizingly close to the line as this sale was, it did not come within the explicit terms of the statute. We need not speculate upon whether Congress, if it had given consideration to the unusual kind of situation before us, would have drawn a more sophisticated type of line so as to produce a result favorable to petitioners. The point is that it chose to legislate in terms of a hard and fast rule. Therefore, regardless of whatever appealing equities may exist in petitioners' favor, we are left with no alternative but to conclude on this record that the gains in issue were not "subsection *88 (d) [gains]". Decisions will be entered under Rule 155. Footnotes
1. Although the parties have stipulated the returns of the Wieses for both 1971 and 1972, they stipulated the return of the Andersons only for the year 1971. However, since the transaction now in dispute took place in 1971, the absence of the Andersons' 1972 return does not appear to be of any present significance.↩
*. Terminated for cause by Pace.↩
*. The underscoring shown above in this letter was on the document as submitted in evidence, and appears to have been done by hand.↩
*. All the underscoring in these minutes was on the documents as submitted in evidence, and appears to have been done by hand.↩
2. A second document, also entitled "SUPPLEMENT TO OPTION TO PURCHASE STOCK", was made a part of the record of this case. Although purporting to be an agreement between Pace and all of the Wiese, Inc. stockholders, this second document was signed only by W. E. Askey for Pace and by Mr. Wiese (acting only on his own behalf), and was not dated. It provided both the alternative option contained in the agreement described in the text (i.e. an option to purchase all the Wiese, Inc. stock for $3.5 million cash) and a third alternative option (an option to purchase the stock for an $800,000 cash downpayment and a note for $3,000,000 payable over ten years). Insofar as the record indicates, this document never represented an agreement of the parties.↩
3. If the conditions of section 1201(d)(1) are satisfied, then all of the gain would qualify as "subsection (d) gain," and would be taxed at the 25 percent rate. However, if section 1201(d)(1) does not apply, then, by reason of section 1201(d)(3)↩ the amount of "subsection (d) gain" would be limited to $50,000 in respect of each of the petitioner couples on the record herein.
4. See, supra,↩ pp. 8-9. 5. We received much of this evidence subject to the Government's objection that it was inadmissible due to the parol evidence rule. Because we do not find the evidence persuasive support for petitioners' contentions, we need not decide whether it is in any event inadmissible. We note, however, that the parol evidence rule generally has only limited applicability in cases before this Court, where the result depends upon the interpretation of written documents to which the Commissioner was not a party. See, e.g., Daniel Coven,66 T.C. 295, 306 fn. 8; Estate of Leon Holtz,38 T.C. 37, 41; Haverty Realty & Investment Co.,3 T.C. 161, 167↩.
6. At trial and on brief, petitioners have argued that the November 6, 1969, AGREEMENT did not affect the EXTENSION OF PLEDGE AND TRUST AGREEMENT of August 12, 1969. However, provide two alternative routes for making that connection. However, on the basis of the record before us, we hold that the October 18, 1971, STOCK PURCHASE AGREEMENT: (1) this contention is entirely without merit. It is flatly contradicted both by the text of the November 6, 1969, AGREEMENT, and by the August 12, 1969, document itself which could in no way be construed as a binding contract, independent of the March 27, 1969, PLEDGE AND TRUST AGREEMENT to which it relates. ↩
7. In our view, the record of the 1970 audit of H. E. Wiese, Inc., has only limited significance in the case now before us. Petitioners, however, claim that the Commissioner is bound herein by virtue of the 1971 settlement of Wiese, Inc.'s tax liability. They assert that upon audit, Wiese, Inc., was not allowed to deduct during its taxable year ended February 28, 1970, the legal and accounting fees paid between February 3, 1969, and January 21, 1970, in connection with its acquisition by Pace. Therefore, according to petitioners, the Government must have prevailed in the position which it adopted at that time, namely, that those expenses were attributable to an ongoing project and must be capitalized. Thus, say petitioners, Having initially prevailed in its position that due to a binding agreement to sell the stock of the corporation, certain legal expenses had to be capitalized, respondent is estopped from now denying that such an agreement was in effect. But petitioners' argument, though vigorously presented, is defective in many critical respects. Neither the doctrine of estoppel, nor any "duty of consistency" supposedly applicable to the Commissioner's actions, requires us to reject the Government's position therein. In the first place, it must be remembered that the item relating to the deduction of legal fees was only one of a number of items in controversy at that time, and that the entire controversy was disposed of by settlement. We have no way of knowing on the record before us what elements of give and take played a part in that settlement, and we cannot say that the disallowance of the fee deduction in the final settlement represented anything more than one aspect of mutual concessions that are common in dispositions by settlement. Moreover, even if the disallowance of this item was deliberately agreed to by both sides in the final settlement, unaffected by the disposition of other items, the record before us fails to establish the precise reason for the disallowance, and we cannot say with reasonable confidence whether the claimed deduction of the legal fees was disallowed on the ground now urged by petitioners as in conflict with respondent's present position or on some other ground unrelated to the present controversy. Thus, we cannot find on this record that the disposition of Wiese, Inc.'s 1970 tax liability was based upon a theory inconsistent with the Government's position herein. Moreover, petitioners have not explained how they relied to their detriment on any position adopted by the Commissioner in the earlier controversy. And so we need not consider the other substantial questions which arise in connection with petitioners' attempt to bind the Commissioner on the basis of a settlement involving a different taxpayer. Cf. Elizabeth Lewis Saigh,36 T.C. 395, 424↩.
8. Admittedly, the evidence on this point is somewhat ambiguous. In particular, the text of the letter dated October 8, 1969, from Mr. Wiese to Mr. Askey is internally inconsistent. It opens with the statement that it was written "to confirm the agreement A. K. McInnis, Paul Anderson and [Mr. Wiese] reached with you on your last visit to Baton Rouge". But it concludes with a reference to "the new agreement when consumated [sic]". And it is plain from the letter, that certain terms of the option had not yet been agreed upon. Furthermore, only the three principal Wiese, Inc. stockholders were present on October 8, 1969. There is no evidence that these three individuals had the authority to bind the absent stockholders to an agreement. And yet when the formal OPTION TO PURCHASE STOCK was signed on November 12, 1969, it was signed by each of the Wiese, Inc. stockholders. Likewise, at a meeting of the board of directors of Pace held on October 27, 1969, Mr. Askey stated that - he would need [Pace's] Board [of Directors'] approval to negotiate an option with the shareholders of H. E. Wiese, Inc. for the purchase of their stock. And he received that approval in a resolution quoted in our findings, supra, at p. 13. Finally, neither the written version of the option nor the supplement thereto refers to an agreement made on October 8, 1969. The OPTION TO PURCHASE STOCK executed November 12, 1969, which petitioners claim was merely the written embodiment of their existing oral agreement, recites that it was "made November 12, 1969". The SUPPLEMENT TO OPTIION TO PURCHASE STOCK executed June 30, 1971, states that - WHEREAS under the AGREEMENT made November 12, 1969, * * * Pace was given an option to purchase all of the * * * stock of H. E. Wiese, Inc. and also specifies that the supplemental option was to be "effective as of November 12, 1969".↩
9. The June 30, 1971, SUPPLEMENT TO OPTION TO PURCHASE STOCK, does not specify when the alternative option contained therein was to terminate. However, in view of the close relationship between this option and the one of November 12, 1969, and in view of the fact that an option for an indefinite time is not legally binding in Louisiana ( Becker and Associates, Inc. v. Lou-ArkEquipment Rentals Co. Inc.,331 So. 2d 474, 476-477; Bristo v. Christine Oil and Gas Co.,139 La. 312, 71 So. 521; Clark v. Dixon,254 So. 2d 482↩ (La. App.)), we think the record as a whole calls for the conclusion that the parties intended this option to expire on October 15, 1971, as provided in the November 12, 1969, agreement. 10. We realize of course that the STOCK PURCHASE AGREEMENT recited that it was "made and entered into as of July 1, 1971". But the record firmly establishes, and we have found as a fact, that the agreement was not finally concluded until October 18, 1971. We do not doubt that the parties to the contract could have adjusted retroactively the allocation of certain of the burdens and benefits of ownership, as between themselves. However, an agreement to make such a retroactive adjustment, does not establish that a sale which took place in October actually took place in July so as to meet a limit imposed by law. See, e.g., Dezendorf v. Commissioner,312 F. 2d 95, 97-98 (C.A. 5), Frank R. Hammerstrom,60 T.C. 167, 183; cf. Elisabeth L. Deyoe,66 T.C. 904↩.